STATE OF NORTH CAROLINA v. LARRY RAY GODWIN

No. 195A92

(Filed 17 June 1994)

1. **Criminal Law § 106 (NCI4th)— murder—discovery—list of State's witnesses**

     The trial court did not err in a first-degree murder prosecution by denying defendant's request for a list of the State's witnesses prior to jury selection. *State v. Covington*, 317 N.C. 127, did not alter the long-standing rule that a defendant has no right to pretrial discovery of potential State's witnesses but at most recognized that during jury selection the trial court has the discretion to order either side to furnish the other with a list of witnesses.

     **Am Jur 2d, Depositions and Discovery §§ 428 et seq.**

2. **Criminal Law § 113 (NCI4th)— first-degree murder— discovery—statement not known to State**

     The trial court did not err in a first-degree murder prosecution by admitting testimony regarding a statement made by defendant to a coworker where defendant had made a mo-

STATE v. GODWIN

[336 N.C. 499 (1994)]

tion for discovery under N.C.G.S. § 15A-903, the statement had not been furnished to defendant, the trial court conducted an extensive *voir dire*, and the witness admitted that he had not made the specific statement in question prior to his testimony. The State cannot reasonably be expected to relate a statement to defendant of which it has no knowledge.

**Am Jur 2d, Depositions and Discovery § 443.**

**Right of defendant in criminal case to inspection of statement of prosecution's witness for purposes of cross-examination or impeachment. 7 ALR3d 181.**

3. **Criminal Law § 109 (NCI4th) — first-degree murder — reciprocal discovery — no error**

The trial court did not err in a first-degree murder prosecution by ordering reciprocal discovery by defendant within two weeks after the State met its discovery deadline where the State sought to obtain from defendant any psychiatric evidence which defendant intended to offer. N.C.G.S. § 15A-905(b) requires defendant to produce psychiatric evidence if he intends to use such evidence and sets no time limitation by which defendant must furnish the State with discovery. Defendant has made no showing that the time set by the trial court was unreasonable, defendant still had flexibility in determining his trial strategy and in assessing what evidence he would actually introduce, and any evidence obtained after the deadline would be available as long as defendant complied with the continuing duty to disclose.

**Am Jur 2d, Depositions and Discovery §§ 462 et seq.**

4. **Jury § 120 (NCI4th) — first-degree murder — jury selection — list of improper questions — no error**

The trial court did not err in a first-degree murder prosecution by furnishing a list of "improper questions" to both parties during jury selection and directing that none of those questions be asked. The list was not submitted on appeal, and defendant has shown neither prejudice nor clear abuse of discretion.

**Am Jur 2d, Jury §§ 201, 202.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by

STATE v. GODWIN

[336 N.C. 499 (1994)]

Duke, J., at the 2 December 1991 Criminal Session of Superior Court, Pitt County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments was allowed by the Supreme Court on 3 May 1993. Heard in the Supreme Court 16 November 1993.

*Michael F. Easley, Attorney General, by William B. Crumpler, Associate Attorney General, for the State.*

*Jeffery B. Foster for defendant-appellant.*

FRYE, Justice.

Defendant was tried capitally on indictments charging him with the first-degree murder of his former wife, Mamie Paulette Brock; armed robbery; first-degree kidnapping; conspiracy to commit first-degree murder; conspiracy to commit kidnapping; and conspiracy to commit armed robbery. The jury returned verdicts finding defendant guilty of all charges. Conviction for first-degree murder was based solely on the felony-murder rule. Following the capital sentencing proceeding for the first-degree murder conviction, the trial court imposed a sentence of life imprisonment as recommended by the jury. The court arrested judgment on the armed robbery and kidnapping convictions. As to each count of conspiracy, the court sentenced defendant to the presumptive term of three years imprisonment.

In this appeal, defendant has raised fourteen assignments of error, nine of which were dismissed by this Court upon motion of the Attorney General for failure to comply with the Rules of Appellate Procedure, specifically Rules 28(a) and 28(b)(5). We shall consider the remaining five assignments of error.

Evidence presented at trial tended to show the following: after a marriage of about eighteen years, defendant and Brock divorced some seven years prior to the events in question. During the seven to eight months preceding her death, Brock and defendant resumed living together in a mobile home behind the "Hard Times Club" in Pitt County. Defendant and Brock had a strained relationship, and she had planned to move on 13 August 1990 but did not do so. However, defendant had already found another roommate, a man who worked with him named Michael Burnshausen.

Defendant was employed as a mechanic at a tire service center in Greenville. Brock was an assistant manager at a Hardee's

restaurant on East Tenth Street in Greenville. Her duties as assistant manager included making night deposits at bank depositories upon leaving work. Mary Cook, a general manager for Hardee's Food Systems was responsible for several restaurants in the Greenville area including the one at which Brock worked. On Tuesday, 14 August 1990, at approximately 10:00 a.m., Cook discovered that Brock had not arrived at work. She began making inquiries as to Brock's whereabouts and went to Brock's residence to look for her. She did not get an answer at the residence. Cook determined that the restaurant had collected around $293.00 the preceding night. She also determined that one of the bank deposit bags and a deposit slip were missing.

On 14 August 1990, Detective D.R. Best of the Greenville Police Department and a deputy from the Pitt County Sheriff's Department went to the mobile home to look for Brock. When they entered the residence they found Burnshausen hiding in a closet. As a result of talking with Burnshausen, Detective Best and the other officers, including Detective Ronald Smith of the Pitt County Sheriff's Department, went to a heavily wooded area in Beaufort County along Blount's Creek Road that was used for logging. Detective Smith turned off the road and drove down a muddy path as directed by Burnshausen.

Detective Smith stopped at the end of a path and radioed for the other officers to join him because he could go no further in his vehicle. From there, officers walked about forty-five feet to a point in the woods where they found the victim's body covered with pine straw, leaves and sticks. She had on a pair of socks, a Hardee's uniform shirt that was unbuttoned and laid open, and a white bra; she had on no pants or panties. A white blood-stained cloth covered her face.

Dr. L. Stanley Harris, a pathologist, performed the autopsy at Pitt County Memorial Hospital on 15 August 1990. Brock had four gunshot wounds; two to her face, one to the left temple area, and one to the back of her head. There were seven blunt trauma injuries over the top and back of the victim's head. Most of these injuries penetrated through the scalp to the bone, although the bone was not broken. Dr. Harris opined that these injuries would have been caused by a minimum of seven separate striking blows at different angles. Injuries to Brock's face appeared to have been inflicted by a softer implement rather than a hard one. Other blunt

traumas found on her arms and hands were consistent with defensive reactions.

On 15 August 1990, S.B.I. Agent James M. Wilson, along with other officers, found defendant at his mother's mobile home in the Blount's Creek area of Beaufort County and arrested him for Brock's murder. Defendant made a statement about Brock's death to Agent Wilson and Detective Best. After describing the domestic problems that he and Brock were having, defendant stated that he and Brock had a confrontation at Hardee's on the evening of 13 August, after which he returned to his mobile home. Burnshausen was at the mobile home. When defendant told him about the confrontation, Burnshausen suggested that they rob Brock in order to get even with her. Around 11:00 p.m., defendant and Burnshausen went to Hardee's. Burnshausen parked defendant's car where Brock could not see it, and defendant went to Brock's car and got into the back seat to wait for her to come out of the restaurant. Defendant told Burnshausen to follow them in defendant's car. Sometime around midnight, Brock came out of the Hardee's restaurant, got into her car, put the bank deposit bag on the front seat, and started out of the driveway. Defendant raised up in the back seat, which frightened Brock at first; then she became angry. She agreed to pull over and get into the passenger seat and then defendant drove down Highway 33. Burnshausen followed them.

Defendant stated that he turned on Dumpster Road, drove down the road about a quarter of a mile, and stopped. Brock saw Burnshausen pull up behind them and questioned why he was there. Defendant and Brock then began fighting inside and outside the car. Defendant stated that while they were fighting in the car, his .25 caliber gun, which he had loaned to Brock because she was uneasy about closing the restaurant, slid from under the seat. Defendant stated that he picked up the gun before getting out of the car and pointed it at Brock to scare her. They began fighting over the gun when it went off twice, striking her in the head. The gun jammed and Brock fell to the ground. Defendant ran back to the car where Burnshausen was, gave him the gun, and told him that Brock had been shot.

According to defendant, Brock then ran by the car and he ran after her. They fell in the ditch while fighting and at some point went back to the victim's car. Defendant looked around and saw Burnshausen who stated that they had "gone too far to turn

STATE v. GODWIN

[336 N.C. 499 (1994)]

back now." Burnshausen took the gun and went to the victim. Defendant walked back to the car. He heard a shot and ran back to where Burnshausen and Brock were and found Burnshausen standing over Brock beating her in the head with some type of stick. Burnshausen stated that the victim was not dead. Defendant reached down to strangle her.

Defendant and Burnshausen decided to get rid of Brock's body. They put her in the trunk of defendant's car while she was still alive. They left the victim's car on Dumpster Road and drove defendant's car toward Washington. They drove a couple of miles along Old Blount's Creek Road and turned down an old logging road. They drove onto another path and went to a dead end where they stopped and got out of the car. Burnshausen opened the trunk and they picked the victim up and laid her on the ground at the edge of the woods while she was still breathing. Burnshausen then put a rag over her face and suffocated her. Burnshausen said that they needed to make this look like a kidnapping, robbery, rape, and murder, so they needed to leave some rape evidence. He removed the victim's panties, slacks and shoes. Defendant walked out of the woods, leaving Burnshausen with the victim.

Defendant stated that he and Burnshausen returned to the victim's car on Dumpster Road. Burnshausen drove defendant's car while defendant drove Brock's car about a mile or so and parked it on a path. They then started back towards Greenville in defendant's car, stopping at a store where Burnshausen purchased some garbage bags. On the way to Greenville, they counted and divided the money they had taken from Brock. They then went to the dumpster behind the "Hard Times Club" and put Brock's clothing, the bank deposit bag, and other things in the garbage bags and threw them in a dumpster. Both defendant and Burnshausen went to work later that day. After work, defendant went to his mother's residence where he was later arrested.

Defendant offered no evidence.

Additional evidence will be discussed as it becomes relevant to a fuller understanding of the specific issues raised on appeal.

[1] By his first assignment of error, defendant argues that the trial court committed reversible error in denying defendant's request for a list of the State's witnesses prior to jury selection. Defendant concedes that under the case law and statutory law

of North Carolina, he has no right to pretrial discovery of potential State's witnesses. *See, e.g.,* N.C.G.S. § 15A-903 (1988); N.C.G.S. § 15A-904 (1988); *State v. Myers,* 299 N.C. 671, 263 S.E.2d 768 (1980); *State v. Dollar,* 292 N.C. 344, 233 S.E.2d 521 (1977); *State v. Smith,* 291 N.C. 505, 231 S.E.2d 663 (1977). Nevertheless, he contends that under *State v. Covington,* 317 N.C. 127, 343 S.E.2d 524 (1986), he was entitled to receive a list of the State's witnesses prior to jury selection. In *Covington,* the trial judge, after a hearing on defendant's motion, required the State to furnish to the defendant the names of its witnesses prior to jury selection. Defendant's contention on appeal was that the trial court erred by not granting a continuance of the trial upon the defendant's first learning of the names and addresses of the State's witnesses. In rejecting this contention, we acknowledged the "long-standing rule in North Carolina that a criminal defendant does not have the right to discover in advance of trial the names and addresses of the State's prospective witnesses." *Id.* at 130, 343 S.E.2d at 526. Contrary to defendant's argument, *Covington* did not alter this long-standing rule but at most recognized that during jury selection the trial court has discretion to order either side to furnish the other with a list of witnesses. *See State v. Smith,* 320 N.C. 404, 414, 358 S.E.2d 329, 334-35 (1987) (trial court did not err or abuse its discretion in requiring defendant to furnish list of witnesses prior to jury selection); *but see State v. Smith,* 291 N.C. 505, 523-524, 231 S.E.2d 663, 675 (1977) (trial judges should not encourage what the legislature specifically rejected by requiring the State to furnish advance list of witnesses to defendants). We conclude that defendant had no *right* to a list of the State's witnesses, and defendant has not shown specific prejudice so as to constitute an abuse of discretion by the trial court in denying his request.

[2] Defendant next argues that, because the State violated the discovery rules of N.C.G.S. § 15A-903(a), the trial court abused its discretion in admitting testimony regarding a statement made by him to a coworker. Prior to trial, defendant made a motion for discovery under N.C.G.S. § 15A-903 which deals with disclosure of evidence by the State.

The State called Horace Wiley during its case-in-chief. Wiley testified that he received a telephone call from defendant after defendant's arrest for the murder of Brock. In response to the State's question, "Did he [defendant] say anything about Michael Bernshausen?", Wiley replied, "That Mike didn't do it, he [defend-

STATE v. GODWIN

[336 N.C. 499 (1994)]

ant] did it." Defendant objected to this testimony and made a motion to strike. The trial court overruled the objection and denied the motion to strike. After the State concluded its direct examination of Wiley, court was recessed for the evening. At that time, defendant requested copies of any statements that he had made to any officers. The State complied with this request.

When the trial resumed the next day, the defense made a motion to strike "all reference to [Wiley's] testimony from the trial of the case." At the hearing on the motion, defendant argued that the State failed to comply with his prior discovery motion under N.C.G.S. § 15A-903(a), by not providing the substance of all statements made by him resulting in the admission of damaging, surprise testimony. The State argued that Wiley had not made this statement prior to testifying and that the substance of this statement was consistent with other statements made by defendant provided in discovery. Called by the defense to testify at the hearing, Wiley indicated that he had not previously related this specific statement to the State. The trial court denied the motion to strike.

> Upon motion of a defendant, a trial court must order the prosecutor to permit a defendant to inspect and copy any relevant written or recorded statements in the State's control that were made by a defendant. N.C.G.S. § 15A-903(a)(1) (1983). Further, N.C.G.S. § 15A-903(a)(2) provides that upon motion, the trial court must order the prosecutor to divulge any oral statements made by the defendant that are relevant to the case. When a party fails to comply with the order, the trial court may grant a continuance or a recess, prohibit the violating party from introducing the non-disclosed evidence, or enter any other appropriate order. N.C.G.S. § 15A-910 (1983). Because the trial court is not required to impose any sanctions for abuse of discovery orders, what sanctions to impose, if any, is within the trial court's discretion[,] *State v. Alston*, 307 N.C. 321, 298 S.E.2d 631 (1983), including whether to admit or exclude evidence not disclosed in accordance with a discovery order. *State v. Braxton*, 294 N.C. 446, 242 S.E.2d 769 (1978).

*State v. Weeks*, 322 N.C. 152, 171, 367 S.E.2d 895, 906 (1988).

The trial court conducted an extensive *voir dire* on defendant's motion. At that hearing, the State contended that it was not aware of this specific statement prior to Wiley's testimony. Upon question-

ing by defense counsel, Wiley admitted that he had not made the specific statement in question prior to his testimony. N.C.G.S. § 15A-903(a) only requires that the State divulge the substance of those statements made by defendant, "the existence of which is known to the prosecutor or becomes known to him prior to or during the course of trial . . . ." N.C.G.S. § 15A-903(a)(2) (1988). The State cannot reasonably be expected to relate a statement to defendant which it has no knowledge of such as in the case at hand. Under these circumstances, we find that the State did not violate the discovery rules of N.C.G.S. § 15A-903(a); thus, the trial court did not err in allowing this testimony.

[3] By his third assignment of error, defendant argues that the trial court exceeded its authority under N.C.G.S. § 15A-905 in ordering reciprocal discovery by defendant within two weeks after the State met its discovery deadline. The trial court ordered the prosecution to provide discovery to defendant on or before 12 July 1991. The trial court also ordered reciprocal discovery by defendant to the State within two weeks after the State met its deadline. Specifically, the State sought to obtain from defendant any psychiatric evidence which defendant intended to offer in the case. Defendant concedes that N.C.G.S. § 15A-905(b) requires him to produce psychiatric evidence if he intends to use such evidence at the guilt/innocence phase or the sentencing phase of trial but argues that the court should not have placed a two week limitation on the time for compliance with the order when trial was approximately four months away.

N.C.G.S. § 15A-905(b) sets no time limitation by which a defendant must furnish the State with discovery, and defendant has made no showing that the time set by the trial court was unreasonable. Further, under the statute, defendant was only obligated to disclose evidence which it "intended" to use at trial by the end of the two week period set by the trial judge's order. N.C.G.S. § 15A-905(b) (1988). Defendant still had flexibility in determining his trial strategy and in assessing what evidence he would actually introduce. Also, under N.C.G.S. § 15A-907 there is a continuing duty to disclose such evidence discovered prior to or during trial. Thus, any evidence defendant obtained after the reciprocal discovery deadline was also available for his use as long as he complied with section 15A-907. The trial court did not exceed its authority; therefore, this assignment of error is rejected.

Defendant next argues that his first three assignments of error cumulatively demonstrate that he is entitled to a new trial. These assignments of error have been rejected above, likewise, this argument merits no relief.

[4] By his final assignment of error, defendant argues that the trial judge erred in furnishing a list of questions entitled "Improper Jury Questions" to both parties during jury selection. The judge directed that none of those questions be asked. It is well settled that the extent and manner of inquiry during jury selection is within the sound discretion of the trial court. "Therefore, defendant must show prejudice, as well as a clear abuse of discretion, to establish reversible error." *State v. Syriani*, 333 N.C. 350, 372, 428 S.E.2d 118, 129, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993), *reh'g denied*, --- U.S. ---, 126 L. Ed. 2d 707 (1994) (citations omitted). Defendant in this case has shown neither prejudice nor clear abuse of discretion. Moreover, defendant makes it difficult for us to consider the "List of Improper Questions," when he has not submitted the list to this Court. For these reasons, this assignment of error must be rejected.

NO ERROR.