STATE OF NORTH CAROLINA v. TIMOTHY RICHARDSON

No. 232A95

(Filed 24 July 1997)

**1. Jury § 226 (NCI4th)— capital trial—jury selection—death penalty views—excusal for cause without rehabilitation**

The trial court did not err by excusing for cause in a capital trial six prospective jurors who stated unequivocally that they would be unable to vote to impose the death penalty but also stated that they could follow the law as to sentence recommendation without affording defendant the opportunity to attempt to rehabilitate the prospective jurors where additional questioning by defendant would not likely have produced different answers.

**Am Jur 2d, Criminal Law § 685; Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

2. **Jury § 148 (NCI4th)— capital trial—jury selection—automatic vote for death penalty—certain questions not permitted—no *Morgan* error**

The trial court did not improperly limit defendant's questioning of prospective jurors in a capital trial in violation of *Morgan v. Illinois*, 504 U.S. 719, when the court refused to permit certain questions as to whether the jurors would automatically vote for the death penalty if they found defendant guilty of first-degree murder after the jurors had made inconsistent statements on this issue where defendant never challenged the prospective jurors for cause but peremptorily challenged both of them; defendant was subsequently permitted to ask the first prospective juror whether she "would be able to vote for life" if she found defendant guilty and found that the appropriate punishment was life and the juror responded affirmatively, the juror answered "not necessarily" when asked if she believed the appropriate punishment for first-degree murder is always the death penalty, and this juror stated that she could think of circumstances where she could find a defendant guilty of first-degree murder and recommend a sentence of life; defendant was allowed to elicit answers from the second prospective juror indicating that she understood that she must consider the punishments of both life and death, that death should not always be the penalty for first-degree murder, and that it was possible that, under certain facts and circumstances, life would be the appropriate sentence for first-degree murder; and defense counsel thus had an opportunity to ask sufficient questions to intelligently exercise his peremptory challenges. Even assuming *arguendo* that there was *Morgan* error during the *voir dire*, such error was harmless where other questioning revealed, with sufficient specificity, that the jurors would consider a life sentence in the appropriate circumstances.

**Am Jur 2d, Criminal Law § 685; Jury §§ 193, 279.**

3. **Evidence and Witnesses §§ 2047, 2975 (NCI4th)— witness telling truth—testimony by officers—not improper character evidence—explanation of investigation**

In a first-degree murder prosecution wherein the State introduced defendant's pretrial statements which implicated one Hedgepeth as the actual perpetrator, and testimony by Hedgepeth refuted defendant's statements, testimony by one law officer that officers had "checked out" Hedgepeth's story, "taking care to make sure he was telling us the truth," and that in his opinion

STATE v. RICHARDSON

[346 N.C. 520 (1997)]

Hedgepeth had told him the truth, and testimony by a second officer that it appeared that Hedgepeth's story was true did not constitute inadmissible character evidence; rather, this testimony was admissible to explain the officers' investigation following defendant's implication of Hedgepeth and why Hedgepeth had been eliminated as a suspect. Assuming *arguendo* that the admission of this testimony was error, the error was harmless since Hedgepeth and his alibi witnesses testified at trial and the jurors were able to judge Hedgepeth's credibility for themselves. N.C.G.S. § 8C-1, Rules 405(a) and 608.

**Am Jur 2d, Expert and Opinion Evidence §§ 26, 30, 31.**

**4. Homicide § 226 (NCI4th)— first-degree murder—defendant as perpetrator—sufficiency of evidence**

The State's evidence in a first-degree murder prosecution was sufficient for the jury to find that defendant alone abducted the victim from a food store, drove her to a secluded area, and killed her by running over her with her own car, although defendant told officers that he was with one Hedgepeth when Hedgepeth abducted and killed the victim, that he and Hedgepeth went back to the store, and that Hedgepeth went inside the store while he parked his car, where the evidence tended to show that the store alarm was triggered at 1:50 a.m. on the night of the killing; when officers arrived at the store, they found a car registered to defendant's wife parked behind the store, and the hood was cold, which indicated that the car had been parked for a while; the car was located at defendant's house the morning after the murder; according to the store's security system, there was only one entry into the store after the victim locked it at 11:41 p.m.; fibers from defendant's T-shirt were consistent with fibers found on the victim's shirt; a shoe impression on a piece of plasterboard in the store was made by defendant's right shoe; and defendant went to the house of Hedgepeth's uncle at 2:00 a.m. on the night of the killing and obtained a ride to the vicinity of the food store.

**Am Jur 2d, Homicide § 435.**

**Footprints as evidence. 35 ALR2d 856.**

**5. Homicide § 255 (NCI4th)— first-degree murder—premeditation and deliberation—sufficiency of evidence**

The State's evidence was sufficient to support defendant's conviction of first-degree murder based on premeditation and

**STATE v. RICHARDSON**

[346 N.C. 520 (1997)]

deliberation where it tended to show that defendant abducted the victim from a food store, drove her to a secluded area, and ran her down with her own car; as the victim tried to crawl away, defendant ran over her again; and defendant then went back to the store to make a robbery attempt.

**Am Jur 2d, Homicide § 439.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

6. **Homicide § 260 (NCI4th)— first-degree murder—lying in wait—sufficiency of evidence**

The State's evidence was sufficient to be submitted to the jury on a charge of first-degree murder on the basis of lying in wait where it would permit the jury to find that defendant drove into the parking lot of a food store from the side entrance so that the victim would not see him; he waited fifteen minutes for the victim to come out and close the store; defendant ran up to the victim and the victim did not see him until he was right up to her; defendant abducted the victim, drove her to a secluded area, and ran over her with her own car; and defendant went back to the store to make a robbery attempt.

**Am Jur 2d, Homicide § 49.**

**Homicide: what constitutes "lying in wait". 89 ALR2d 1140.**

7. **Homicide § 283 (NCI4th)— felony murder—kidnapping as underlying felony—sufficiency of evidence**

The evidence supported submission to the jury of the charge of felony murder with kidnapping as the underlying felony where it tended to show that defendant abducted the victim as she closed a food store, transported her in her car to the location of the murder, took her keys, ran over with her own car, and then drove back to the store to make a robbery attempt.

**Am Jur 2d, Abduction and Kidnapping § 12; Homicide §§ 46, 72, 73.**

**8. Homicide §§ 506, 705 (NCI4th)— felony murder—kidnapping and armed robbery as predicates—insufficient evidence of armed robbery—guilty verdict—absence of prejudice**

Although kidnapping and armed robbery were submitted to the jury as predicate offenses of felony murder, and the evidence was insufficient to support a charge of armed robbery, defendant's conviction of felony murder was not affected thereby where the court instructed the jury that it must find defendant guilty of one or both of those offenses in order to convict him of felony murder; the jury found defendant guilty of first-degree kidnapping and not guilty of armed robbery; and the jury thus necessarily convicted defendant of felony murder based on kidnapping as the underlying felony. Assuming *arguendo* that the jury erroneously found defendant guilty under the theory of felony murder based on the charge of armed robbery, defendant was not prejudiced since he was also found guilty of first-degree murder based on theories of lying in wait and premeditation and deliberation.

**Am Jur 2d, Abduction and Kidnapping § 12; Homicide §§ 46, 72.**

**9. Criminal Law § 481 (NCI4th Rev.)— capital trial—closing argument—caution not to read indictment**

The trial court did not impermissibly limit defense counsel's closing argument in a prosecution for first-degree murder and first-degree kidnapping by cautioning counsel, who was holding an indictment in his hand as he argued, that he was very close to using the exact language in the indictment and that he should not read the indictment to the jury.

**Am Jur 2d, Trial §§ 187, 544.**

**10. Criminal Law § 1402 (NCI4th Rev.)— death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder is proportionate to other cases in which the death penalty has been affirmed, considering both the crime and the defendant, where defendant was convicted on theories of premeditation and deliberation, felony murder, and lying in wait; the evidence supported the jury's finding of the aggravating circumstances that the murder was committed for pecuniary gain and that it was

especially heinous, atrocious, or cruel; defendant was twenty-nine years old at the time of the murder; defendant abducted the victim as she closed a food store and transported her to a secluded area; defendant made no effort to assist the victim, but ran over the victim repeatedly with her car and left her to die; defendant, whose only objective after the killing was to attempt to rob the food store, showed no remorse; the victim suffered physical and psychological torture before she died; and the victim had numerous repeated episodes of trauma to her body which were inflicted prior to and after her death and was not only in pain, but was also aware of her impending death as she attempted to run away from defendant.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Sumner, J., at the 24 April 1995 Criminal Session of Superior Court, Nash County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment was allowed 23 January 1996. Heard in the Supreme Court 15 October 1996.

*Michael F. Easley, Attorney General, by Mary D. Winstead, Assistant Attorney General, for the State.*

*J. Clark Fischer for defendant-appellant.*

PARKER, Justice.

Defendant was indicted for first-degree murder, first-degree kidnapping, and robbery with a dangerous weapon. The jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation, felony murder, and lying in wait and guilty of first-degree kidnapping. Defendant was acquitted on the robbery with a dangerous weapon charge. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder; and the trial court sentenced accordingly. The trial court sentenced defendant to forty years' imprisonment for the first-

degree kidnapping conviction to begin at the expiration of the murder sentence.

On 6 October 1993 twenty-three-year-old Tracy Marie Rich (victim) went to work at the L & L Food Store in Castalia, North Carolina. Linda Rich, the victim's mother, spoke with her daughter at approximately 10:00 p.m. According to the computer records of the alarm system installed at the store, the victim closed the store at 11:41 p.m. Ordinarily, the victim would arrive home from work around 11:40 or 11:50 p.m. When her daughter did not return home at her usual time, Linda Rich became worried and drove to the store. Ms. Rich did not find her daughter at the store and did not see anything unusual at the scene; Ms. Rich returned home.

The store's front-door motion detector and alarm "tripped" at 1:50 a.m. on 7 October. Lieutenant Leonard Brantley of the Nash County Sheriff's Department was called to the store. Brantley checked the rear of the store and found it to be secure. Another officer informed Brantley that the front door was also secure. Brantley noticed a red car parked behind the store. The car was unoccupied, and no heat was coming from the hood. Brantley subsequently learned that the car was registered to Terry Richardson, defendant's wife. Neither Brantley nor other officers at the store observed anything out of order, and they left the scene. The front-door alarm did not indicate that the front door was opened again until the next morning when the store was opened for business.

Rose Hankerson, the assistant store manager, arrived at the store on 7 October at approximately 5:55 a.m. and unlocked the store, which was equipped with a two-way lock. When Hankerson reached to put her key in to relock the door from the inside, she noticed that there was a key already in the door. Hankerson walked to the back of the store to turn off the alarm system and saw what she recognized as the victim's key ring lying on the floor. When Hankerson turned the store lights on, she noticed that part of the store's ceiling had been knocked out and was lying on the floor. At this time Hankerson called the Sheriff's Department.

Lieutenant Brantley returned to the store shortly after 6:00 a.m. Pieces of plasterboard from the ceiling were on the floor inside the store. There were also indications that someone had attempted to move the store safe. A ventilator opening on the rear of the building had also been removed. Brantley observed that the red car was gone.

**STATE v. RICHARDSON**

[346 N.C. 520 (1997)]

The victim's body was found wedged under her car on a dirt road not far from the store. The victim's tennis shoe and her eyeglasses were found in the road near the car. The eyeglasses appeared to have been run over by a vehicle.

Because defendant's wife's car had been seen at the store the previous night, defendant became a suspect in the murder investigation. Officers went to defendant's home and located defendant hiding in the attic. Defendant was arrested and gave several statements to law enforcement officers.

In defendant's first statement he denied any knowledge of the murder. Defendant told officers that he went to work on the morning of the sixth and then went home for the rest of the night. Defendant stated that he hid from the officers because he thought they were after him for writing a bad check.

When confronted with inconsistencies in his original statement, defendant gave a second statement in which he implicated Kevin Hedgepeth. Defendant stated that he gave Hedgepeth a ride to the store so he could get some money. According to defendant, Hedgepeth grabbed the victim when she came out of the store, put her in the passenger side of her car, and motioned for defendant to follow in his car. Defendant followed Hedgepeth and the victim to a dirt road. Defendant stated that he saw the victim run by his car and that he witnessed Hedgepeth run over the victim. Defendant told officers that the victim attempted to crawl out of the road and that Hedgepeth backed up and ran over her again.

Defendant stated that Hedgepeth came over to his car and got in the passenger side. Hedgepeth told defendant that he had some money and wanted "to go to get a rock" (crack cocaine). Defendant stated that after purchasing "a rock," Hedgepeth told him that he wanted to go back to the store because he had the keys.

Defendant stated that he and Hedgepeth returned to the store, and Hedgepeth went inside while defendant parked the car. Defendant then also went into the store. When officers arrived at the store in response to the alarm, Hedgepeth hid inside the store and defendant left through the roof. After the officers left the area, Hedgepeth also left the store through the roof. Defendant stated that he gave Hedgepeth a ride home and that Hedgepeth gave him thirty dollars. Defendant stated that he knew Hedgepeth did not have any money before the victim was murdered.

After defendant gave his second statement, the police located Kevin Hedgepeth. Hedgepeth told officers that on 6 October, he got home around 11:00 p.m. Hedgepeth stated that defendant arrived at his house at approximately 2:00 a.m. and asked for a ride to Castalia. Defendant told Hedgepeth he was out of gas and needed a ride to his car. Hedgepeth and his uncle dropped defendant off near the store but did not see defendant's car. The police cleared and released Hedgepeth.

In a third statement defendant told officers that he and Hedgepeth were dropped off together by Hedgepeth's uncle at the store. Defendant maintained that Hedgepeth was also present during the murder.

At trial State Bureau of Investigation Special Agent Joyce Petzka, an expert in comparing footprint and tire-track impressions, opined that a shoe impression left on a piece of plasterboard collected from the store was made by defendant's right shoe. Special Agent Jonathon Macy, an expert in the field of forensic fiber identification, testified that fibers taken from the T-shirt defendant was wearing when he was arrested were consistent with fibers found on the victim's shirt. Agent Macy also testified that polyester fibers taken from the plasterboard at the roof entry of the store were consistent with fibers that made up the yarn of defendant's T-shirt.

Dr. Robert E. Zipf testified that the victim died as a result of multiple blunt-force injuries and compression injuries to her body, head, and chest as a result of being hit by and run over with a vehicle.

Defendant presented evidence during the sentencing proceeding that he had been married to Terry Richardson for ten years and had a two-year-old daughter. Mrs. Richardson testified that defendant had a good relationship with his daughter. Mrs. Richardson also testified that defendant had a problem with drugs.

Defendant presented the testimony of two mental health experts. Dr. Billy Royal testified that based upon his evaluation and the results of defendant's testing, defendant suffered from crack-cocaine abuse and dependency, cocaine intoxication which was in remission, marijuana dependency which was in remission, alcohol abuse and alcohol intoxication in remission, borderline mental retardation, mild neurocognitive disorder, and personality disorder. Dr. Royal testified that he felt defendant's retardation was caused by acute lead intoxication

at the age of three. Dr. Royal also testified that the lead accounted for defendant's neurocognitive disorder. Dr. Royal testified that in his opinion defendant's capacity to appreciate the criminality of his conduct was impaired at the time of the crime and that on the date of the murder defendant suffered from an emotional illness that prevented him from appreciating the criminality of the present charge.

Dr. John Gorman testified that defendant had significant difficulty with anything based upon language functioning and that his "overall functioning would be comparable to that of an average eleven-and-a-half [or] twelve-year-old." Dr. Gorman testified that defendant has "fairly significant intellectual limitations" which are aggravated by drug use, making "his judgment and other functionings even less effective than they normally are." Dr. Gorman also opined that defendant "has significant limitations as far as being able to anticipate consequences when he's straight or when he's in regular state of mind. And when he has been ingesting various drugs, I'm sure he has even less capacity to anticipate the consequences of his acts."

The prosecution and defense stipulated that defendant's criminal record consisted of a misdemeanor worthless-check charge in 1989, a misdemeanor larceny in 1991, and several traffic violations.

## JURY SELECTION ISSUES

[1] Defendant first argues that the trial court erroneously excused six prospective jurors who had indicated general opposition to the death penalty but who stated they could follow the law, without affording defendant reasonable opportunity to attempt to rehabilitate the prospective jurors. Defendant argues that prospective jurors Crumel, Brinkley, Howard, Hunter, Mills, and Perry were erroneously excused.

The extent and manner of questioning during jury *voir dire* is within the sound discretion of the trial court. *State v. Godwin*, 336 N.C. 499, 508, 444 S.E.2d 206, 211 (1994). A defendant seeking to have his conviction reversed because of an error in the jury selection process must show a clear abuse of discretion, as well as prejudice. *Id.* Defendant in this case has shown neither prejudice nor abuse of discretion.

A juror is properly excused for cause based on his views on capital punishment if those views would prevent or impair the performance of his duties as a juror in accordance with his instructions

and his oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). In *State v. Brogden*, 334 N.C. 39, 430 S.E.2d 905 (1993), this Court held that a trial court may not prohibit, in a blanket manner, defendant's request to attempt to rehabilitate prospective jurors challenged for cause. However, "[i]t is not an abuse of discretion to refuse to allow the rehabilitation of a juror who has expressed unequivocal opposition to the death penalty." *State v. Norwood*, 344 N.C. 511, 526, 476 S.E.2d 349, 354-55 (1996), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 500 (1997). A prospective juror's bias may not always be provable with unmistakable clarity; in such cases reviewing courts must defer to the trial court's judgment as to whether the prospective juror would be able to follow the law impartially. *State v. Ward*, 338 N.C. 64, 85, 449 S.E.2d 709, 720 (1994), *cert. denied*, 514 U.S. 1134, 131 L. Ed. 2d 1013 (1995).

The examination of prospective juror Crumel is representative of the questioning of the other five prospective jurors at issue in this case and according to defendant "is consistent with the Court's entire conduct of *voir dire* and exemplifies the unconstitutional limitation placed on defendant's participation in the jury selection process." After the trial judge gave a general explanation of the capital sentencing process, the following dialogue took place:

Q. Ms. Crumel, please listen very carefully to the following questions I'm about to ask, and consider your responses very closely before you respond, please.

If you are selected to serve as a juror in this case, can and will you follow the law as it will be explained to you by the court, in deciding whether the defendant is guilty or not guilty of first degree murder or any other lesser offense?

A. Yes, Your Honor.

Q. If you are satisfied beyond a reasonable doubt of those things necessary to constitute first degree murder, can and will you vote to return a verdict of guilty of first degree murder, even though you know that death is one of the possible penalties?

A. Yes, Your Honor.

Q. Considering your personal beliefs, Ms. Crumel, about the death penalty, please state for me whether you would be able or unable to vote for a recommendation of the death penalty, even though you are satisfied beyond a reasonable doubt of the three

things required by law concerning the aggravating and mitigating circumstances that I have previously mentioned to you?

A. Unable.

Q. Unable? If the defendant is convicted of first degree murder, can and will you follow the law of North Carolina as to the sentence recommendation to be made by the jury as the court will explain it?

A. Yes, Your Honor.

The court then excused Crumel for cause and denied defendant's request to rehabilitate her.

We upheld the same process and reason for excusing jurors for cause in *State v. Ward*. The prospective jurors were unequivocal about their inability to render the death penalty; this Court reasoned in *Ward* that additional questioning by defendant would not likely have produced different answers. 338 N.C. at 87-88, 449 S.E.2d at 721-22.

In the instant case the six prospective jurors at issue stated unequivocally that they would be unable to vote to impose the death penalty. The trial court properly excused these jurors for cause and did not abuse its discretion by refusing to allow defendant to question them.

[2] Defendant next argues that the trial court improperly limited defendant's questioning of two prospective jurors, Carolyn Patterson and Patricia Donofrio, in violation of *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992).

In *Morgan* the United States Supreme Court held that a defendant must be allowed an opportunity "to lay bare the foundation of [his] challenge for cause against those prospective jurors who would *always* impose death following conviction." *Id.* at 733, 119 L. Ed. 2d at 506. The Court went on to hold that a defendant is "entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *Id.* at 736, 119 L. Ed. 2d at 507.

In the instant case prospective juror Patterson stated that when she heard about the murder of the victim, she formed the opinion that a person found guilty of this murder "deserve[d] the same thing that

happened to [the victim]." When asked what she meant, Patterson said that "if he is guilty of it, then he should die; if he's not, then there's the life sentence, whatever." Defense counsel then asked, "And so if you were to find him guilty of first degree murder, you would then vote for the death penalty?" The Court interrupted stating, "That's not what she said." Counsel then asked: "Do you believe that if a person is found guilty of first degree murder, that the appropriate punishment would be death?" The court sustained the prosecutor's objection on the basis that Patterson had answered that question.

Patterson subsequently stated that she would not automatically vote for the death penalty. Patterson reiterated her position and said she would not automatically "say [defendant] is guilty and should have the death sentence." The trial court denied defense counsel's request to ask follow-up questions on this issue.

Prospective juror Donofrio gave inconsistent responses, first indicating that if a person was found guilty of first-degree murder, she would automatically vote for the death penalty and then stating that she did not think the death penalty was always indicated. Counsel then asked: "Are you saying that you would or would not automatically vote for the death penalty?" The trial court sustained an objection to that question and subsequent questions on this issue.

In *Morgan v. Illinois* the defendant was not allowed to ask if a juror would "automatically vote to impose the death penalty no matter what the facts are." 504 U.S. at 723, 119 L. Ed. 2d at 499. This Court has held:

> *Morgan* stands for the principle that a defendant in a capital trial must be allowed to make inquiry as to whether a particular juror would automatically vote for the death penalty. "Within this broad principle, however, the trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled; its rulings in this regard will not be reversed absent a showing of abuse of discretion." *State v. Yelverton*, 334 N.C. 532, 541, 434 S.E.2d 183, 188 (1993).

*State v. Robinson*, 336 N.C. 78, 102-03, 443 S.E.2d 306, 317 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995).

In the instant case we conclude that the trial judge did not abuse his discretion during jury *voir dire*. We first note that defendant never made a motion challenging Patterson or Donofrio for cause and

that he peremptorily challenged both of these prospective jurors. Furthermore, defense counsel had an opportunity to ask sufficient questions to intelligently exercise his peremptory challenges as to each of these jurors. As to prospective juror Patterson, defendant was permitted to ask whether she "would be able to vote for life" if she found defendant guilty and found that the appropriate punishment was life. Patterson answered, "If that's what it would come to, yes." She answered "not necessarily" when asked if she believed that the appropriate punishment for first-degree murder is always the death penalty. She stated that she could think of facts and circumstances where she could find a person guilty of first-degree murder and recommend a sentence of life.

Prospective juror Donofrio responded "yes" when asked by defendant whether she "would be able to vote for life." Donofrio later stated that she would automatically vote for the death penalty. Donofrio then stated that she did not believe that the death penalty was always indicated for first-degree murder. When defendant then asked, "Are you saying that you would or would not automatically vote for the death penalty?" the trial court sustained the objection. Defendant was subsequently allowed to elicit answers indicating that Donofrio understood that she must consider the punishments of both life and death; that death should not always be the penalty for first-degree murder; and that it was possible that, under certain facts and circumstances, life would be the appropriate sentence for first-degree murder.

Even assuming *arguendo* that there was *Morgan* error during this *voir dire*, such error is harmless where other questioning reveals, with sufficient specificity, whether the juror will consider a life sentence in the appropriate circumstances. *See State v. Simpson*, 341 N.C. 316, 340, 462 S.E.2d 191, 204 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 194 (1996). We conclude that any error in this case is harmless beyond a reasonable doubt.

## GUILT/INNOCENCE PHASE

[3] Defendant next argues that the trial court erred by allowing Captain Milton Reams and Special Agent Malcolm McLeod to give improper character testimony that Kevin Hedgepeth was telling the truth when he denied responsibility for the victim's murder.

The State introduced defendant's pretrial statements into evidence. The statements were exculpatory to the extent that they

named Hedgepeth as the actual perpetrator. After Reams testified the State then called Hedgepeth to refute defendant's statements. Defendant argues that the prosecution violated N.C.G.S. § 8C-1, Rules 405 and 608 by seeking to strengthen Hedgepeth's testimony and its prosecution strategy with inadmissible character evidence.

Reams testified that officers had "checked out" Hedgepeth's story, "taking care to make sure he was telling us the truth." Reams also testified that in his opinion, Hedgepeth had told him the truth. McLeod similarly testified that it appeared that Hedgepeth's story was true.

Rule 405(a) provides: "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct." N.C.G.S. § 8C-1, Rule 405(a) (1992). Rule 608 provides that evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked.

We conclude that, in the instant case, the officers were not giving character testimony, but rather were explaining their investigation following defendant's implication of Hedgepeth. Reams was not commenting on Hedgepeth's general credibility; he merely told the jury that he believed Hedgepeth had told the truth during the investigation. *See State v. Baker*, 338 N.C. 526, 555, 451 S.E.2d 574, 591 (1994) (holding that the trial court did not abuse its discretion in allowing a detective to testify on rebuttal that a former suspect the defendant contended committed the murder had no motive and had an alibi that checked out). In the instant case when the State laid out its case and presented defendant's statements to law enforcement officers, it was evident to the jurors that defendant had implicated Hedgepeth in the murder. It was then incumbent upon the State to explain to the jurors why Hedgepeth had been eliminated as a suspect.

Assuming *arguendo* that admission of this testimony was error, any error was harmless. Hedgepeth and his alibi witnesses testified at trial. The jurors were able to judge Hedgepeth's credibility for themselves. Furthermore, when the trial judge charged the jurors, he told them that they should assess the credibility of Hedgepeth's testimony and that of his alibi witnesses on their own. "Jurors are presumed to follow the trial court's instructions." *State v. Gregory*, 340 N.C. 365, 408, 459 S.E.2d 638, 663 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996). This assignment of error is overruled.

Defendant next argues that the evidence was insufficient to submit the charge of first-degree murder to the jury under any theory. Defendant was convicted of first-degree murder on the theories of premeditation and deliberation, lying in wait, and felony murder.

When a defendant moves for dismissal, the trial court must determine whether the State has presented substantial evidence of each essential element of the offense charged and substantial evidence that the defendant is the perpetrator. *State v. Olson,* 330 N.C. 557, 564, 411 S.E.2d 592, 595 (1992). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* The trial court must view all of the evidence, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor. *State v. McCullers,* 341 N.C. 19, 28-29, 460 S.E.2d 163, 168 (1995). In evaluating the sufficiency of the evidence, the trial court must determine whether there is "any evidence tending to prove guilt or which reasonably leads to this conclusion as a fairly logical and legitimate deduction." *State v. Franklin,* 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990).

[4] In the instant case the evidence was plenary that defendant actually murdered the victim. At approximately 1:50 a.m. on the night of the killing, the store alarm was triggered. When officers arrived at the store, they found a car registered to defendant's wife parked behind the store. The hood was cold, which indicated that the car had been parked for a while. When officers were called back to the store later that morning, the car was gone.

The morning after the murder, the car was located at defendant's house. When officers arrived at defendant's house, defendant would not answer the door. Defendant was subsequently discovered hiding in the attic. Defendant first denied any knowledge of the murder and told officers he had been at home since the afternoon of 6 October. Confronted with facts inconsistent with his initial statement, defendant gave a detailed statement suggesting that he was with Hedgepeth when Hedgepeth abducted and killed the victim. Defendant also stated that he and Hedgepeth went back to the store and that Hedgepeth went inside the store while he parked the car. Defendant stated that Hedgepeth gave him thirty dollars after coming out of the store.

The State presented evidence which discredited defendant's story. Defendant testified that he drove his car to the murder scene

and that he followed Hedgepeth. However, officers testified that the red car's hood was cold at 2:00 a.m. Defendant stated that after the murder, he and Hedgepeth entered the store separately. However, according to the store's security system, there was only one entry into the store after the victim locked it at 11:41 p.m. Special Agent Macy, an expert in the field of forensic fiber identification, testified that fibers from defendant's T-shirt were consistent with fibers found on the victim's shirt. Special Agent Petzka, an expert in comparing footprint impressions, testified that a shoe impression on a piece of plasterboard in the store was made by defendant's right shoe and that only his shoe could have made that impression.

Robert Manley, Hedgepeth's uncle, testified that defendant came to his house on foot at approximately 2:00 a.m. on the night of the killing and asked for a ride. Defendant told Manley that he had walked there from Castalia and that he was out of gas. Hedgepeth and his uncle gave defendant a ride to the vicinity of the L & L Food Store. This evidence was consistent with the State's theory that defendant alone abducted the victim, drove her to the location of the murder in her car, and then obtained a ride back to the store with Hedgepeth and Manley.

[5] The evidence of premeditation and deliberation is also sufficient. Premeditation means that "defendant contemplated killing for some period of time, however short, before he acted." *State v. Williams*, 334 N.C. 440, 447, 434 S.E.2d 588, 592 (1993), *sentence vacated on other grounds*, 511 U.S. 1001, 128 L. Ed. 2d 42 (1994). Deliberation means that defendant acted in a "cool state of blood," not under the influence of any violent passion suddenly aroused by some lawful or just cause or legal provocation. *Id.* In the instant case the evidence tended to show that defendant abducted the victim from the store, drove her to a secluded area, and ran her down with her own car. As the victim tried to crawl away, defendant drove over her again. Defendant then went back to the store to make a robbery attempt. This evidence is sufficient to withstand a motion to dismiss the charge of first-degree murder based on premeditation and deliberation.

[6] The evidence is also sufficient to support the theory of lying in wait. An assailant who watches and waits in ambush for his victim is lying in wait. *State v. Allison*, 298 N.C. 135, 147-48, 257 S.E.2d 417, 425 (1979). Defendant's statement suggested that he and Hedgepeth drove into the parking lot as the victim was closing the store. Defendant said he pulled in from the side entrance so that the victim

would not see them, that he and Hedgepeth waited fifteen minutes for the victim to come out, that Hedgepeth ran up to the victim, and that the victim never saw Hedgepeth until he was right up to her. Given the substantial evidence that Hedgepeth was in fact not involved in this incident, the inference is that defendant alone carried out these actions. This evidence is sufficient to submit to the jury the charge of first-degree murder on the basis of lying in wait.

The State also submitted the charge of first-degree murder based on the theory of felony murder. A murder committed during the "perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon" is felony murder. N.C.G.S. § 14-17 (1993) (amended 1994). In this case the State sought to prove that defendant murdered the victim during the commission of kidnapping and robbery with a dangerous weapon.

[7] Kidnapping is the confining, restraining, or removing from one place to another of a person sixteen years of age or over without the person's consent and for a purpose prohibited by statute. N.C.G.S. § 14-39(a) (1993) (amended 1994). In this case the State alleged that defendant kidnapped the victim by removing her from one place to another for the purpose of facilitating a robbery. The evidence showing that the victim was transported in her car to the location of the murder, that defendant took the victim's keys, and that he then drove back to and attempted to rob the store amply supports submission of felony murder with kidnapping as the underlying felony.

[8] Robbery with a dangerous weapon, or armed robbery, was also submitted to the jury in support of the charge of felony murder. This Court has defined armed robbery as "the taking of personal property from the person or presence of another, by the use or threatened use of a dangerous weapon, whereby the victim's life is endangered or threatened." *State v. Rasor*, 319 N.C. 577, 587, 356 S.E.2d 328, 334 (1987). The indictment for robbery with a dangerous weapon charge stated that "the defendant committed this act by means of an assault consisting of having in his possession and threatening the use of a handgun whereby the life of Tracy Marie Rich was threatened and endangered." We agree with defendant's contention that there was insufficient evidence of robbery with a dangerous weapon to submit this charge to the jury.

We first note that defendant was acquitted of the charge of robbery with a dangerous weapon; therefore, as to this individual charge,

defendant has not been prejudiced. However, armed robbery was also submitted to the jury in support of the charge of felony murder, for which defendant was found guilty. While kidnapping and armed robbery were submitted to the jury as predicate offenses of the felony murder, the trial court instructed the jury that it must find defendant guilty of one or both of these offenses in order to convict defendant of felony murder. In this case the jury found defendant guilty of first-degree kidnapping and not guilty of armed robbery. We presume that juries follow the court's instructions. *State v. Johnson*, 341 N.C. 104, 115, 459 S.E.2d 246, 252 (1995). Therefore, having acquitted defendant of robbery with a dangerous weapon, the jury, in keeping with the judge's instructions, necessarily convicted defendant of felony murder based on kidnapping as the underlying felony. However, assuming *arguendo* that the jury erroneously found defendant guilty under the theory of felony murder based on the charge of armed robbery, defendant cannot show prejudice since he was also found guilty of first-degree murder based on the theories of lying in wait and premeditation and deliberation. *State v. McLemore*, 343 N.C. 240, 249, 470 S.E.2d 2, 7 (1996). Defendant's conviction and sentence for first-degree murder based on these theories is not affected.

Defendant also argues that the trial court should have dismissed the first-degree kidnapping charge at the close of the State's evidence. We have previously discussed the sufficiency of the evidence for this charge and found no error.

[9] In his last assignment of error, defendant contends the trial court impermissibly limited defendant's guilt/innocence-phase closing argument. Defendant maintains that the court improperly refused to allow counsel to discuss in detail the specific elements of the charges.

During closing argument defense counsel stated, "[M]y client is charged with first degree murder in that he did with malice and forethought [sic] kill and murder [the victim], an act in violation of the statute." The court sustained the State's objection. Counsel then stated that defendant was charged with first-degree kidnapping and that "the indictment so bears out that that's what [defendant] is charged with." The court again sustained the State's objection. In a bench conference the prosecutor stated that the basis for the objection was that no one is permitted to read an indictment to the jury. Defense counsel stated that he was not reading the indictment, but the court cautioned that counsel was very close to using the exact

language of the indictment and that he did not want counsel to "go past that line."

N.C.G.S. § 15-1221(b) provides that at no time during jury selection or during trial may any person read the indictment to the jury. The purpose of this statute is to prevent jurors from receiving a distorted view of the case. *State v. Rogers*, 52 N.C. App. 676, 279 S.E.2d 881 (1981). Defendant argues that this concern is unfounded once evidence has been presented and the case is ready to be submitted to the jury.

In the instant case Judge Sumner merely cautioned the attorney not to read the indictment to the jury. We conclude that the judge's cautionary remarks were appropriate. After being cautioned by the court, counsel told the jury, "I've been practicing law about twenty years and sometimes I get carried away and I should have known that I can't read that piece of paper to you." This statement implies that counsel was holding an indictment in his hand as he argued; the court, seeing that, simply warned the attorney not to read the indictment directly.

Defense counsel was able to argue fully the charges against defendant and to urge that the State had not proven the elements of these crimes. Defense counsel Alford stated to the jury, without objection, "Let's look at the indictment." He then argued, without objection, that no evidence of a handgun had been present and no evidence showed that defendant had kidnapped or robbed anyone. Counsel then stated, "That's what's in the indictment." This assignment of error is overruled.

## PROPORTIONALITY

We are required by N.C.G.S. § 15A-2000(d)(2) to review the record and determine (i) whether the record supports the jury's findings of the aggravating circumstances upon which the court based its death sentence; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). After a thorough review of the transcript, record on appeal, and briefs and oral arguments of counsel, we are convinced that the jury's finding of the aggravating circumstances that the murder was committed for

pecuniary gain and that the murder was especially heinous, atrocious, or cruel was supported by the evidence. We also conclude that nothing in the record suggests that defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

[10] Finally, we must consider whether the imposition of the death penalty in defendant's case is proportionate to other cases in which the death penalty has been affirmed, considering both the crime and the defendant. *Robinson*, 336 N.C. at 133, 443 S.E.2d at 334. The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We compare this case to similar cases within a pool which we defined in *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and in *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Our consideration on proportionality review is limited to cases roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Defendant was convicted of first-degree murder on the theories of premeditation and deliberation, felony murder, and lying in wait. Defendant was also convicted for first-degree kidnapping. The jury found both the submitted aggravating circumstances: (i) that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6) (Supp. 1996); and (ii) that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

While four statutory mitigating circumstances were submitted to the jury, only two were found. The two statutory mitigating circumstances found by the jury were: (i) defendant has no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); and (ii) the

murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2). The jury declined to find the statutory mitigating circumstances that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6), and the catchall mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). The nonstatutory mitigating circumstances found by the jury are as follows: (i) defendant's prior criminal convictions consist solely of misdemeanors, with none of the prior convictions involving violence; (ii) defendant is borderline mentally retarded, with an IQ of 73; (iii) defendant is addicted to crack cocaine; (iv) at an important stage in his development, defendant suffered from the homicide of his brother, which resulted in significant changes in his personality and behavior; (v) defendant ingested lead at an early age and suffered from lead poisoning; and (vi) defendant has no prior history of violent conduct.

We begin our analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. This Court has determined the death sentence to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

In five of the seven cases in which this Court has concluded that the death penalty was disproportionate, the jury did not find the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181; *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163; *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703. Because the jury in the present case found this statutory aggravating circumstance to exist, this case is easily distinguishable from those cases. As we have previously stated, "[w]hile this fact is certainly not dispositive, it does serve as an indication that the sentence of death . . . is not disproportionate." *State v. Walls*, 342 N.C. 1, 72, 463 S.E.2d 738, 777 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 794 (1996).

In the other two cases in which we have concluded that the death penalty was disproportionate, the jury did find that the murders were especially heinous, atrocious, or cruel. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653; *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170. Both cases are distinguishable from the present case on other grounds.

In *State v. Stokes* the Court emphasized that the defendant was found guilty of first-degree murder based upon the felony murder rule; that there was little, if any, evidence of premeditation and deliberation; and that the defendant was seventeen years old at the time of the murder. *Id.* at 21, 24, 352 S.E.2d at 664, 666. In the instant case defendant was twenty-nine years old at the time of the murder and was found guilty of first-degree murder on the basis of premeditation and deliberation. This case is also distinguishable from *Stokes* because the jury in the present case found an additional aggravating circumstance, that the murder was committed for pecuniary gain.

In *State v. Bondurant* the defendant shot the victim but then immediately directed the driver of the car in which they had been riding to proceed to the emergency room of the hospital. In concluding that the death penalty was disproportionate, we focused on the defendant's immediate attempt to obtain medical assistance for the victim and the lack of any apparent motive for the killing. In contrast the evidence in the present case tended to show that defendant made no efforts to assist the victim. Instead, defendant ran over the victim repeatedly with her car and left her to die. Defendant, whose only objective after the killing was to attempt to rob the L & L Food Store, showed no remorse.

Another distinguishing characteristic of this case is that two aggravating circumstances were found by the jury. Of the seven cases in which this Court has found a sentence of death disproportionate, in only two, *Bondurant* and *State v. Young*, 312 N.C. 669, 325 S.E.2d 181, did the jury find the existence of multiple aggravating circumstances. *Bondurant*, as discussed above, is clearly distinguishable. In *Young* this Court focused on the failure of the jury to find the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance. The present case is distinguishable from *Young* in that one of the aggravating circumstances found by the jury was that the murder was especially heinous, atrocious, or cruel.

Additionally, there is evidence that the victim suffered physical and psychological torture before she died. Dr. Zipf testified that the victim had numerous repeated episodes of trauma to her body which

were inflicted prior to and after death; thus, she was not only in pain, but was also aware of her impending death as she attempted to run from defendant. That defendant was convicted on the theory of premeditation and deliberation is also significant. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

Although we have repeatedly stated that we review all of the cases in the pool when engaging in this statutory duty, it is worth noting again that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. We conclude the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment. *See, e.g., State v. Rowsey*, 343 N.C. 603, 472 S.E.2d 903 (1996), *cert. denied,* —— U.S. ——, 137 L. Ed. 2d 221 (1997), in which the victim, as in this case, was the lone employee at a convenience store in the middle of the night and was, therefore, vulnerable.

Accordingly, we conclude that defendant received a fair trial free from prejudicial error and that the sentence of death recommended by the jury and ordered by the trial court in the present case is not disproportionate.

NO ERROR.