**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TIMOTHY RICHARDSON,

    *Petitioner-Appellee,*

    v.

GERALD J. BRANKER, Warden,
Central Prison, Raleigh, North
Carolina,

    *Respondent-Appellant.*

No. 11-1

TIMOTHY RICHARDSON,

    *Petitioner-Appellant,*

    v.

GERALD J. BRANKER, Warden,
Central Prison, Raleigh, North
Carolina,

    *Respondent-Appellee.*

No. 11-2

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:08-hc-02163-BO)

Argued: December 7, 2011

Decided: February 6, 2012

Before TRAXLER, Chief Judge, and MOTZ and KEENAN,
Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Keenan wrote the opinion, in which Chief Judge Traxler and Judge Motz joined.

---

## COUNSEL

**ARGUED:** Jonathan Porter Babb, Sr., NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellant/Cross-Appellee. Stanley F. Hammer, WYATT, EARLY, HARRIS & WHEELER, LLP, High Point, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Roy Cooper, Attorney General, Raleigh, North Carolina, for Appellant/Cross-Appellee. Kenneth J. Rose, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellee/Cross-Appellant.

---

## OPINION

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal, the State of North Carolina seeks reversal of the district court's judgment granting a writ of habeas corpus to Timothy Richardson. In granting the writ, the district court vacated the sentence of death imposed after Richardson's conviction for first-degree murder. The district court concluded that the state courts of North Carolina unreasonably applied the Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984), in rejecting Richardson's claim that his attorney on direct appeal failed to provide effective assistance of counsel. The district court held that Richardson's appellate counsel rendered ineffective assistance by not raising on direct appeal the state trial court's failure to instruct the jury at sentencing concerning the statutory mitigating factor of Richardson's age.

Although the district court granted Richardson's petition with respect to his *Strickland* claim, the district court rejected Richardson's additional claims that he was entitled to a writ of habeas corpus because the prosecution withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (the *Brady* claim), and that he was mentally retarded and thus could not be sentenced to death following the decision in *Atkins v. Virginia*, 536 U.S. 304 (2002) (the *Atkins* claim). Richardson has filed a cross-appeal in this Court, asserting that the district court erred in rejecting his *Brady* and *Atkins* claims.

In reviewing the parties' arguments, we are guided and restricted by the statutory language of 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (hereafter, we use the term "AEDPA" to refer to 28 U.S.C. § 2254 as amended), and a wealth of Supreme Court precedent interpreting and applying this statute. We are mindful that "state courts are the principal forum for asserting constitutional challenges to state convictions," that habeas corpus proceedings are a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal," and that a federal court may only issue the writ if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Harrington v. Richter*, ___ U.S. ,___ 131 S. Ct. 770, 786-87 (2011) (citation and internal quotation marks omitted).

Upon our review, we hold that the district court's decision granting Richardson's petition runs contrary to the deference that federal courts are required to afford state court decisions adjudicating the merits of habeas corpus claims. Accordingly, we reverse the portion of the district court's judgment granting Richardson's petition on his claim of ineffective assistance of counsel, and we affirm the remainder of the district court's judgment rejecting Richardson's petition on his *Brady* and *Atkins* claims.

## I.

We briefly set forth the facts of this matter, because the issues presented primarily involve questions of law rather than questions of fact, and because the Supreme Court of North Carolina previously has provided in great detail the factual background of this case. *See State v. Richardson*, 488 S.E.2d 148 (N.C. 1997).

## A.

Timothy Richardson was convicted by a jury in 1995 of first-degree murder and first-degree kidnapping in connection with the death of Tracy Marie Rich.[1] *Id.* at 151. The evidence at trial showed that on October 6, 1993, Richardson abducted Ms. Rich after her work shift at the L & L Food Store (the store) in Castalia, North Carolina. *Id.* at 151, 157. As stated by the Supreme Court of North Carolina, "the evidence tended to show that [Richardson] abducted the victim from the store, drove her to a secluded area, and ran her down with her own car. As the victim tried to crawl away, [Richardson] drove over her again. [Richardson] then went back to the store to make a robbery attempt." *Id.* at 157. Ms. Rich's lifeless body was found wedged under her car. *Id.* at 152. The cause of Ms. Rich's death was "multiple blunt-force injuries and compression injuries to her body, head, and chest as a result of being hit by and run over with a vehicle." *Id.* at 153.

Ample evidence supported the jury's finding that Richardson was the perpetrator who killed Ms. Rich. The prosecution presented the testimony of an expert in the field of forensic fiber identification, who testified that fibers from Richardson's t-shirt were consistent with fibers found on Ms. Rich's shirt. *Id.* at 153, 157. Another expert witness testified that a

---

[1]The jury found Richardson guilty of first-degree murder on three separate bases: 1) malice, premeditation, and deliberation; 2) felony murder; and 3) lying in wait. 488 S.E.2d at 151.

shoe impression found on a piece of plasterboard inside the store could only have been made by Richardson's right shoe. *Id.* at 152-53, 157.

Additionally, during the course of the abduction, the store's alarm "tripped." *Id.* at 151. This caused a police officer to come to the store, where he observed a red car that he later learned was registered to Terry Richardson, the defendant's wife. *Id.* Police officers suspected that Richardson had participated in the crime, and they went to Richardson's home and arrested him after finding him hiding in the attic. *Id.* at 152, 157-58.

Richardson initially denied any knowledge of Ms. Rich's murder, but later told police officers that he was present during the crime while an acquaintance, Kevin Hedgepeth, killed Ms. Rich.[2] *Id.* at 152. The police interviewed Hedgepeth, as well as several witnesses who provided an alibi for Hedgepeth, and determined that Hedgepeth was not involved in Ms. Rich's murder. *Id.* at 152, 156-57. The evidence obtained during the police investigation also discredited numerous other aspects of Richardson's story, rendering Richardson's statements implicating Hedgepeth implausible. *Id.* at 152, 157. Hedgepeth and his alibi witnesses testified at Richardson's trial. *Id.* at 156.

After the jury convicted Richardson of first-degree murder and first-degree kidnapping,[3] the case proceeded to the sentencing phase. The jury found as aggravating circumstances

---

[2]Richardson first stated that he gave Hedgepeth a ride to the store in order for Hedgepeth to "get some money," and that Hedgepeth grabbed Ms. Rich when she came out of the store. *Id.* at 152. Richardson later amended his story, telling police that he and Hedgepeth were "dropped off" at the store by Hedgepeth's uncle. *Id.* In each of these versions of his story, Richardson maintained that he witnessed Hedgepeth repeatedly "run over" Ms. Rich with her car. *Id.* at 152.

[3]The jury acquitted Richardson of the additional charge of robbery with a dangerous weapon. *Id.* at 151.

that the murder was committed for pecuniary gain, and that the murder was especially heinous, atrocious, or cruel. *Id.* at 160.

The trial court instructed the jury on four statutory mitigating factors, including: (i) that the defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (ii) that the murder was committed while the defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (iii) that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); and (iv) any other circumstance arising from the evidence which the jury deems to have mitigating value, N.C.G.S. § 15A-2000(f)(9) (the "catchall" mitigating factor). 488 S.E.2d at 160. The jury found that the first two of these mitigating factors were applicable under the evidence, but declined to find the latter two mitigating factors.[4] *Id.* Notably, Richardson's defense counsel did not ask for, and the trial judge did not submit, the statutory mitigating factor of "[t]he age of the defendant at the time of the crime," N.C.G.S. § 15A-2000(f)(7) (the (f)(7) mitigation instruction).[5]

---

[4]The jury also found present several non-statutory mitigating factors, including that: (i) the defendant's prior criminal convictions consisted solely of misdemeanors, and none of those prior convictions involved violence; (ii) the defendant had an IQ of 73; (iii) the defendant was addicted to crack cocaine; (iv) at an important stage in his development, the defendant suffered from the homicide of his brother, which resulted in significant changes in the defendant's personality and behavior; (v) the defendant ingested lead at an early age and suffered from lead poisoning; and (vi) the defendant had no prior history of violent conduct. *Id.* at 160.

[5]North Carolina courts do not construe the term "age" solely as a person's chronological age for purposes of whether the (f)(7) mitigating instruction should be given. Instead, "age" is a "flexible and relative concept" that takes into consideration emotional maturity in addition to chronological age. *See State v. Johnson*, 346 S.E.2d 596, 624 (N.C. 1986). Thus, Richardson's chronological age of 31 years at the time of the offense would not have foreclosed the availability of the (f)(7) mitigation instruction.

After balancing the mitigating and aggravating circumstances, the jury recommended a sentence of death. 488 S.E.2d at 151, 160. The trial court followed the jury's recommendation and sentenced Richardson to death, in addition to a sentence of forty years' imprisonment for the first-degree kidnapping conviction. *Id.* at 151.

B.

Richardson filed an appeal with the Supreme Court of North Carolina, in which his appellate counsel raised six guilt-phase issues, and one sentencing-phase issue challenging the proportionality of Richardson's death sentence. Richardson's appellate counsel did not raise as error the state trial court's failure to instruct the jury on the (f)(7) mitigation factor. The Supreme Court of North Carolina affirmed Richardson's convictions and sentences. *Id.* at 162.

In March 1999, Richardson filed a Motion for Appropriate Relief in the Superior Court of Nash County, North Carolina (the MAR court), seeking to vacate his convictions and sentences. In his motion, Richardson raised numerous claims, including claims regarding the effectiveness of his trial counsel, the effectiveness of his appellate counsel, and the State's purported withholding of certain exculpatory evidence. Richardson later filed two amended Motions for Appropriate Relief, adding a second category of allegedly exculpatory evidence withheld by the State, as well as a claim that he was mentally retarded and thus could not be executed under state and federal law.[6]

Richardson's argument of ineffective assistance of appel-

---

[6]Richardson raised the claim that he was mentally retarded and could not be executed before the Supreme Court issued its decision in *Atkins*, in which the Court held that the execution of mentally retarded individuals violated the Eighth Amendment's prohibition against cruel and unusual punishments. 536 U.S. 304.

late counsel was based on his appellate counsel's failure to argue that the trial court should have submitted the (f)(7) mitigation instruction to the jury. In support of this argument, Richardson submitted the affidavit of his appellate counsel, who averred that he "was aware that [Richardson's] mental age was that of [sic] eleven and one-half or twelve years old and that his I.Q. was 73," but that "[t]he law regarding this mitigating factor [was] not clarified until after [Richardson's] trial."[7]

The MAR court adjudicated the merits of Richardson's claims and denied them.[8] With respect to the (f)(7) mitigation instruction issue, the MAR court held as follows:

> (f) As to [Richardson's] allegation of ineffective assistance of appellate counsel this Court again looks to the decisions in *Strickland* and [*State v.*] *Braswell*, [312 N.C. 553 (1984)] [.]
>
> (g) That this Court finds as a fact in review of this claim that this claim is without merit. [Richardson] has failed to establish that his appellate counsel's

---

[7]In the affidavit, Richardson's appellate counsel also averred that "I do not recall ever giving significant consideration to raising this issue, because absent a request for this instruction, review would likely have been under the plain error standard." We observe that Richardson's appellate counsel's statement, that the plain error standard of review would have applied to this claim had it been raised on appeal for the first time, is incorrect as a matter of law. *See State v. Holden*, 450 S.E.2d 878, 885 (N.C. 1994) (holding that, irrespective whether the defendant's attorney requests an (f)(7) mitigation instruction, the trial court has an "independent duty" to submit the instruction if it is warranted by the evidence); *see also State v. Spruill*, 452 S.E.2d 279, 305 (N.C. 1994) (considering, without mention of the plain error standard of review, defendant's argument concerning the (f)(7) mitigation instruction despite defendant's failure to request that the instruction be given to the jury).

[8]The MAR court did not consider the merits of several claims that the court held were procedurally barred, but none of those claims is at issue on this appeal.

representation fell below an objective standard of reasonableness. This Court further finds that there is no reasonable probability that in the absence of appellate counsel's alleged errors the results of the proceedings would have been different.

(h) The Court also finds that no evidentiary hearing is required in that [Richardson's] allegation of ineffective assistance of appellate counsel involves a question of law and not fact.

(i) The Court also finds, upon full review of this claim, that if [Richardson's] allegations were indeed errors, and this Court specifically finds no errors, such errors would be harmless beyond a reasonable doubt.

The MAR court also rejected Richardson's argument that the State withheld from him certain exculpatory evidence, in violation of *Brady*. The MAR court held that Richardson's *Brady* claim was procedurally barred, but also held alternatively on the merits that there were no errors with respect to this issue, and that, even if there were errors, they "were harmless beyond a reasonable doubt." The MAR court further held that "the Court finds as a fact that there is no reasonable possibility that, had the alleged error in question not been committed, a different result would have been reached at the trial."

With respect to Richardson's claim that he was mentally retarded and could not be executed without violating the Eighth and Fourteenth Amendments, the MAR court initially deferred ruling on the claim and ordered an evidentiary hearing. At the hearing, the parties introduced the testimony of their respective mental health experts. After considering this evidence, the MAR court entered an order denying the mental retardation claim. The MAR court's order, issued after the Supreme Court decided *Atkins*, included numerous findings of

fact supporting the MAR court's conclusion. After setting forth its factual findings, the MAR court held:

> [Richardson] has experienced some difficulty in the area of adaptive functioning, but [ ] he is not significantly impaired in his adaptive functioning as required by [N.C.G.S. §] 15A-2002. The Court also finds that there is some evidence that [Richardson] suffers some reduced mental capacity, but that he is not mentally retarded as set out in [N.C.G.S. §] 15A-2005. The Court further finds that the defendant has failed to meet the burden of proof requiring the defendant to show that he has significantly sub average adaptive skills in at least two areas as set out in the General Statutes of North Carolina. The defendant has also failed to show that he suffers from Mental Retardation as required by [N.C.G.S. §] 15A-2005.

After the MAR court denied Richardson's claims, Richardson filed a petition for a writ of certiorari in the Supreme Court of North Carolina. That court denied Richardson's petition. 667 S.E.2d 272 (N.C. 2008).

## C.

In November 2008, Richardson filed a petition for a writ of habeas corpus (the habeas petition) in the United States District Court for the Eastern District of North Carolina, naming as respondent Gerald Branker, the warden of Central Prison located in Raleigh, North Carolina (hereafter, the State). Richardson argued that the MAR court's denial of his motion for appropriate relief was based on an unreasonable determination of facts and application of United States Supreme Court precedent. Richardson raised four grounds for relief in his petition, including that: (1) the State withheld exculpatory evidence in violation of *Brady* that would have corroborated Richardson's theory that his acquaintance, Kevin Hedgepeth,

murdered Ms. Rich; (2) his trial counsel rendered ineffective assistance by not moving to suppress certain statements Richardson made while in police custody; (3) Richardson's appellate counsel rendered ineffective assistance by not raising as error the trial court's failure to provide the jury at sentencing the (f)(7) mitigation instruction; and (4) he is mentally retarded and therefore his death sentence violates the Eighth Amendment, under the Supreme Court's decision in *Atkins*. The State answered the habeas petition, and filed a motion for summary judgment.

The district court granted Richardson a writ of habeas corpus with respect to his claim that he received ineffective assistance of appellate counsel. 769 F. Supp. 2d 896, 928 (E.D.N.C. 2011). The district court held that North Carolina law mandates that a trial court submit for the jury's consideration any statutory mitigating factor that is supported by substantial evidence, even if the defendant does not make such a request. *Id.* at 919 (citing N.C.G.S. § 15A-2000(b) and *State v. Holden*, 450 S.E.2d 878, 885 (N.C. 1994)). Without addressing the decision in *State v. Spruill*, 452 S.E.2d 279 (N.C. 1994), the primary case relied upon by the State that sets forth a legal standard seemingly irreconcilable with the decision in *Holden*, the district court concluded that "North Carolina law supporting petitioner's claim was established months before petitioner's trial and well before his appeal." *Id.* at 921.

Stating that it was "considering the issue de novo," *id.* at 924, the district court set forth the evidence presented by Richardson that "[h]is overall functioning would be comparable to that of an average eleven-and-a-half, twelve year old," and that he suffered from alcohol and drug abuse, mild neurocognitive disorder, personality disorder, and borderline mental retardation. *Id.* at 920, 922. Based on its consideration of Richardson's evidence, the district court held that appellate counsel's failure to challenge as error the absence of a (f)(7) mitigation instruction was unreasonable. *Id.* at 921. Addition-

ally, relying on the decision in *Holden*, as well as on the decision in *State v. Zuniga*, 498 S.E.2d 611 (N.C. 1998), an appeal decided well after Richardson's appeal was argued, the district court held that "had counsel raised the [(f)(7) mitigation instruction] issue on appeal, there is a reasonable probability petitioner would have prevailed." *Id.* at 921-22. The district court further concluded that "the State is unable to show the error likely would have been found to be harmless beyond a reasonable doubt on appeal." *Id.* at 922.

Because the district court considered Richardson's ineffective assistance of counsel claim de novo, the court did not accord any deference to the MAR court's resolution of this claim. The only reference to the MAR court in this section of the district court's analysis is the conclusion that "[t]he [MAR] court's determination to the contrary is based on an unreasonable determination of the facts and an unreasonable application of *Smith v. Robbins*[, 528 U.S. 259 (2000),] and *Strickland*." 769 F. Supp. 2d at 924.

The district court ordered that Richardson be sentenced to a term of life imprisonment unless the State initiated new sentencing proceedings within 180 days of the district court's order. *Id.* at 928. With respect to Richardson's claim of ineffective assistance of trial counsel, his *Atkins* claim, and his *Brady* claim, the district court granted the State's motion for summary judgment, holding that Richardson failed to establish that he was entitled to a writ of habeas corpus on those claims. *Id.* at 908-19, 924-28.

The State timely filed a notice of appeal to the district court's grant of the habeas petition on Richardson's claim of ineffective assistance of appellate counsel. Richardson filed an application for a certificate of appealability regarding the claims that were denied by the district court. The district court granted the application in part and denied it in part, granting the certificate with respect to Richardson's *Brady* and *Atkins* claims.

## II.

## A.

### i.

We first address the district court's decision granting a writ of habeas corpus to Richardson on his claim of ineffective assistance of appellate counsel. We review de novo the district court's order granting Richardson relief on this claim. *Kanai v. McHugh*, 638 F.3d 251, 260 (4th Cir. 2011).

AEDPA governs federal courts' consideration of a state prisoner's petition for a writ of habeas corpus. The standard set forth by AEDPA (the AEDPA standard) mandates that a writ of habeas corpus "shall not be granted" for any claim that was adjudicated on the merits in a state court proceeding unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[9]

28 U.S.C. § 2254(d); *Harrington*, 131 S. Ct. at 785; *DeCastro v. Branker*, 642 F.3d 442, 449 (4th Cir. 2011).

The limited scope of federal review of a state petitioner's

---

[9]Richardson does not dispute that the MAR court adjudicated the merits of his claim of ineffective assistance of appellate counsel. We also note that our analysis primarily applies the first prong of the AEDPA standard because Richardson's arguments concern issues of law, rather than factual determinations.

habeas claims, as established by AEDPA, is grounded in fundamental notions of state sovereignty. *Harrington*, 131 S. Ct. at 787. When a federal court adjudicates a habeas corpus petition brought by a state prisoner, that adjudication constitutes an intrusion on state sovereignty. *See id.* ("Federal habeas review of state convictions . . . intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.") (Citation omitted). However, AEDPA restricts that intrusion of state sovereignty by limiting the federal courts' power to issue a writ to exceptional circumstances, thereby helping to ensure that "state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding." *Id.* The restrictive standard of review established by AEDPA "further[s] the principles of comity, finality, and federalism." *Williams v. Taylor*, 529 U.S. 362, 436 (2000).

The Supreme Court's recent decision in *Harrington*, which also involved a habeas claim alleging ineffective assistance of counsel, is instructive regarding the significant deference that federal courts must accord to state court decisions adjudicating habeas corpus claims on their merits. As the Supreme Court observed, "[t]he pivotal question is whether the state court's application of the [applicable federal legal] standard was *unreasonable*." 131 S. Ct. at 785 (emphasis added).

Fundamentally, "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (quoting *Williams*, 529 U.S. at 410) (emphasis in original). The standard of an "unreasonable" application of federal law requires a "substantially higher threshold" to obtain relief than the standard of an "incorrect" application of federal law. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[S]o long as 'fairminded jurists could disagree on the correctness of [a] state court's decision,'" a state court's adjudication that a habeas claim fails on its merits cannot be overturned by a federal court. *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "even a strong

case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786 (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).

Accordingly, Richardson had the burden of establishing that the MAR court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. As stated by the Supreme Court, this is a standard that "is difficult to meet . . . because it was meant to be." *Id.* at 786.

Additionally, when a petitioner's habeas corpus claim is based on alleged ineffective assistance of counsel, we review the claim through the additional lens of *Strickland* and its progeny, as discussed below. The AEDPA standard and the *Strickland* standard are dual and overlapping, and we apply the two standards simultaneously rather than sequentially. *See Harrington*, 131 S. Ct. at 788. This imposes a very high burden for a petitioner to overcome, because these standards are each "highly deferential" to the state court's adjudication and, "when the two apply in tandem, review is doubly so." *Id.* (citations and internal quotation marks omitted).

To prevail on a claim of ineffective assistance of counsel,[10] a petitioner ordinarily must satisfy both parts of the two-part test set forth in *Strickland. Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams*, 529 U.S. at 390; *Strickland*, 466 U.S. at 687; *Jackson v. Kelly*, 650 F.3d 477, 493 (4th Cir. 2011).

---

[10]As the Supreme Court explained in *Strickland*, the Sixth Amendment's guarantee of "'the right to counsel is the right to the effective assistance of counsel.'" 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). Although *Strickland* involved a claim concerning the alleged ineffective assistance of the defendant's trial counsel, the right to effective assistance of appellate counsel, as well as the *Strickland* standard for evaluating an ineffective assistance of counsel claim, was extended to appellate proceedings in *Smith v. Murray*, 477 U.S. 527 (1986), and *Smith v. Robbins*, 528 U.S. 259 (2000).

The petitioner first must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88; *accord Wiggins*, 539 U.S. at 521; *Williams*, 529 U.S. at 390–91; *Sharpe v. Bell*, 593 F.3d 372, 382 (4th Cir. 2010). In making this determination, a court considering the habeas corpus petition "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *accord Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Darden v. Wainwright*, 477 U.S. 168, 185–86 (1986); *United States v. Tucker*, 603 F.3d 260, 264 (4th Cir. 2010).

If counsel's performance is found to have been deficient under the first part of the *Strickland* standard, to obtain relief the petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *accord Wiggins*, 539 U.S. at 534; *Williams*, 529 U.S. at 391; *Gray v. Branker*, 529 F.3d 220, 234 (4th Cir. 2008). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," *Strickland*, 466 U.S. at 694, and "[t]he likelihood of a different result must be *substantial*, not just conceivable," *Harrington*, 131 S. Ct. at 792 (emphasis added); *accord Jackson*, 650 F.3d at 493.

In the context of a claim of ineffective assistance of appellate counsel, the "proceeding" at issue is the forum in which the petitioner's appeal was heard, which in this case was the Supreme Court of North Carolina. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000) (holding, in the context of an ineffective assistance of appellate counsel claim, that the "prejudice" element of the *Strickland* standard is satisfied by a showing of a reasonable probability defendant would have prevailed on appeal but for appellate counsel's deficient performance); *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (en banc) (same). Therefore, for purposes of *Strickland*'s "prejudice" prong, as applied in tandem with the AEDPA standard, Richardson

must demonstrate that the MAR court incorrectly and unreasonably concluded that Richardson failed to demonstrate there was a "reasonable probability" the Supreme Court of North Carolina would have held in his favor had his appellate counsel raised the issue of the (f)(7) mitigation instruction in the direct appeal.

ii.

As an initial matter, we conclude that the district court erred in considering Richardson's *Strickland* claim under a de novo standard of review. In a manner almost identical to the Ninth Circuit's error in *Harrington*, the district court explicitly conducted a de novo review, concluded that Richardson's counsel rendered ineffective assistance under *Strickland*, and stated in a conclusory manner that "[t]he MAR court's determination to the contrary is based on an unreasonable determination of the facts and an unreasonable application of [*Strickland*]."[11] 769 F. Supp. 2d at 924. However, as the Supreme Court stated in *Harrington*, "AEDPA demands more."[12] 131 S. Ct. at 786; *see also Bell*, 236 F.3d at 157 (recognizing that federal courts may not conduct de novo review of habeas corpus claims that were adjudicated on the merits by a state court).

In holding that the Ninth Circuit erred in considering Harrington's habeas corpus petition de novo, the Supreme Court provided further instruction concerning federal courts' duties

[11]In *Harrington*, the Supreme Court observed that the Ninth Circuit "explicitly conducted a de novo review, and after finding a *Strickland* violation, it declared, without further explanation, that the 'state court's decision to the contrary constituted an unreasonable application of *Strickland*.'" 131 S. Ct. at 786 (internal citation omitted).

[12]We observe that, before AEDPA's enactment in 1996, federal courts were required to exercise independent judgment when reviewing a state prisoner's application for habeas relief. *See Bell v. Jarvis*, 236 F.3d 149, 159-60 (4th Cir. 2000) (en banc) (discussing *Williams v. Taylor*, 529 U.S. 362, 399-401 (2000) (O'Connor, J., concurring)).

when considering a habeas corpus claim. The Supreme Court emphasized that, under AEDPA,

> a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Harrington*, 131 S. Ct. at 786. In short, AEDPA "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

We turn to apply this method of analysis to Richardson's claim of ineffective assistance of appellate counsel. We remain mindful of the Supreme Court's statement in *Strickland* that a reviewing court is not required to address the issue whether "counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." 466 U.S. at 697. As instructed by the Court, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*; *see also Buckner v. Polk*, 453 F.3d 195, 202 (4th Cir. 2006) (following Supreme Court's instruction in *Strickland* to proceed directly to "prejudice" prong if petitioner cannot demonstrate reasonable probability that outcome of trial would be different but for counsel's performance). Accordingly, we address Richardson's claim of ineffective assistance of appellate counsel under the "prejudice" prong of *Strickland*.

Under the dual, overlapping lenses of AEDPA and *Strickland*, we ask the following question: Was the MAR court's holding that "there is no reasonable probability that in the absence of appellate counsel's alleged errors the results of the proceedings would have been different" incorrect to a degree

that this conclusion "was so lacking in justification that [it] was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement?" *See Harrington*, 131 S. Ct. at 786-87.

Central to our consideration of this question is the district court's conclusion that, at the time of Richardson's direct appeal, settled North Carolina law mandated that trial courts submit to the jury any statutory mitigating factor that was supported by substantial evidence. *See* 769 F. Supp. 2d at 919, 921. The district court held that, therefore, there was a "reasonable probability [Richardson] would have prevailed on appeal had the [(f)(7) mitigation instruction issue] been raised." *Id.* at 921, 924.

We disagree with the district court's holding for several reasons. First, the district court erred in not affording any deference to the MAR court's contrary conclusion. When a claim of ineffective assistance of counsel raised in a habeas corpus petition involves an issue unique to state law, such as the availability of the (f)(7) mitigation instruction at issue here, a federal court should be especially deferential to a state post-conviction court's interpretation of its own state's law. Indeed, we have held that "[i]t is beyond the mandate of federal habeas courts [ ] to correct the interpretation by state courts of a state's own laws." *Sharpe v. Bell,* 593 F.3d 372, 383 (4th Cir. 2010) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)) (additional citation omitted); *see also Woodford*, 537 U.S. at 24 (under AEDPA, state court decisions must be given the benefit of the doubt). This required deference to the MAR court's adjudication of Richardson's claim of ineffective assistance of appellate counsel was wholly lacking in the district court's consideration of the habeas petition.

Second, when viewed under the applicable AEDPA standard, it is manifest that Richardson failed to establish that the MAR court's decision was "so lacking in justification that [it] was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *See Harrington*, 131 S. Ct. at 786-87. Moreover, we conclude that the law regarding the circumstances in which a North Carolina trial court must submit the (f)(7) mitigation instruction to the jury was not settled at the time of Richardson's appeal. As discussed below, the unsettled nature of North Carolina law on this issue precludes a finding that Richardson demonstrated a "reasonable probability" that he would have prevailed on his direct appeal had his appellate counsel raised the (f)(7) mitigation instruction issue.

The district court, relying on the decision in *Holden*, 450 S.E.2d 878, wholly failed to consider the contrary holding of *Spruill*, 452 S.E.2d 279, another case involving the (f)(7) mitigation instruction decided by the Supreme Court of North Carolina three weeks after the decision in *Holden*. In *Holden*, the Supreme Court of North Carolina held that a trial court has an independent duty to submit the (f)(7) statutory mitigating factor to the jury whenever "substantial evidence" supports that factor. 450 S.E.2d at 885. The court accordingly applied this "substantial evidence" standard, holding that although Holden was thirty-years old at the time of his offense, the (f)(7) mitigation instruction should have been given to the jury because he presented evidence that he had (1) an I.Q. score of 56, in the mentally retarded range, and (2) a "mental age" of ten years.[13] *Id.* at 882, 885.

In *Spruill*, however, the Supreme Court of North Carolina rejected the defendant's argument that the trial court erred in failing to submit the (f)(7) mitigation instruction to the jury, despite Spruill's evidence that he was "emotionally immature," had I.Q. scores of 64 and 74, placing him in either the range of mild mental retardation or the "low borderline range of intellectual functioning," had personality disorders, and

---

[13]The court held that the instruction should have been given despite evidence that Holden "had more life experience than a ten-year-old-child." 450 S.E.2d at 885.

read at a level below the sixth grade. 452 S.E.2d at 284-86, 305. Notably, the decision in *Spruill* did not cite *Holden* or apply the "substantial evidence" standard used in that case.

Instead, in *Spruill*, the Supreme Court of North Carolina applied a "counterbalancing evidence" standard, considering evidence of the defendant's "more mature qualities and characteristics."[14] *Id.* at 305 (citation omitted). The court held that "[w]here evidence of emotional immaturity is *counterbalanced* by a chronological age of [thirty-one] years, apparently normal physical and intellectual development, and experience, the trial court is *not required* to submit the mitigating circumstance of age." *Id.* (citing *State v. Johnson*, 346 S.E.2d 596 (N.C. 1986)) (emphasis added).

We conclude that the "substantial evidence" standard, as set forth in *Holden*, and the "counterbalancing evidence" standard, as articulated in *Spruill*, are diametrically conflicting. It is difficult to predict which of these two standards would have been applied by the Supreme Court of North Carolina had Richardson's appellate counsel raised the (f)(7) mitigation instruction issue on direct appeal.[15] Application of these dif-

---

[14]The court observed that Spruill was "thirty-one years old, had worked as an automobile mechanic and in a shipyard, moved on to a better position, attended church, and functioned quite well in the community." 452 S.E.2d at 305.

[15]The Supreme Court of North Carolina ultimately may have applied *Spruill*'s "counterbalancing evidence" standard, because that standard has been applied by that Court in several more recent cases. *See, e.g.*, *State v. Hurst*, 624 S.E.2d 309, 323-25 (N.C. 2006) (applying *Spruill*'s "counterbalancing evidence" standard in rejecting defendant's argument that he was entitled to a (f)(7) mitigating instruction); *State v. Thompson*, 604 S.E.2d 850, 867-68 (N.C. 2004) (same); *State v. Call*, 545 S.E.2d 190, 198-99 (N.C. 2001) (same); *State v. Steen*, 536 S.E.2d 1, 18-20 (N.C. 2000) (same); *State v. Meyer*, 540 S.E.2d 1, 6 (N.C. 2000) (same). In contrast, we have found only two decisions in which the Supreme Court of North Carolina applied *Holden*'s "substantial evidence" standard. *See State v. Zuniga*, 498 S.E.2d 611, 612-13 (N.C. 1998) (applying *Holden*'s

ferent standards may well have yielded different results under the facts of this case. For instance, Richardson's evidence that he had I.Q. scores of 73 and 74, and had a "mental age" and "overall functioning" comparable to an average eleven-and-a-half or twelve-year-old, may have been sufficient to require submission of the mitigation instruction under *Holden*'s "substantial evidence" test.

Here, however, the State developed "counterbalancing" evidence suggesting that Richardson displayed the socially adaptive behavior of an adult. The evidence of such behavior includes Richardson's involvement in a 10-year marriage, his ability to maintain good, loving relationships with his wife and daughter, and Richardson's significant employment history.[16] Additionally, Richardson's own witness, Dr. John Gorman, who qualified as an expert in the field of clinical psychology, testified that Richardson did not display "excess anger, hostility, or grudges." The inclusion of this evidence presented by the State, when viewed under *Spruill*'s "counterbalancing evidence" standard, likely would have supported the absence of an (f)(7) mitigation instruction in this case.[17]

---

"substantial evidence" standard in holding trial court erred in not submitting (f)(7) mitigating instruction); *State v. Hooks*, 548 S.E.2d 501, 509 (N.C. 2001) (applying *Holden*'s "substantial evidence" standard but holding trial court did not err in failing to submit the (f)(2) mitigating factor that defendant committed the crime under the influence of mental or emotional disturbance).

[16]The evidence showed that Richardson was able to maintain steady employment. He worked for a textile plant for about two years, and later worked for his father's brick-washing business four or five days per week.

[17]There is a suggestion that the district court considered the "counterbalancing evidence" standard, albeit without citing *Spruill* in the course of that discussion. The district court stated that "[w]hen factors such as petitioner's chronological age, life experience, and intellectual development are considered, they do not counterbalance the substantial evidence of petitioner's young mental age." 769 F. Supp. 2d at 922. We disagree with this conclusion, which, in any event, completely fails to afford the deference required by AEDPA to the MAR court's holding.

The plain and irreconcilable conflict presented by the *Holden* and *Spruill* standards demonstrates that North Carolina law was not settled with respect to this issue at the time of Richardson's appeal. Thus, given the AEDPA standard that we apply in tandem with the standard set forth in *Strickland*, we need only return to our original question: Was the MAR court's holding that "there is no reasonable probability that in the absence of appellate counsel's alleged errors the results of the proceedings would have been different" incorrect to a degree that this conclusion "was so lacking in justification that [it] was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement?" In this case, as we have observed, an application of the "counterbalancing evidence" standard from *Spruill* to the similar evidence found in the present record could well have supported the MAR court's decision denying Richardson relief on his claim of ineffective assistance of appellate counsel. Accordingly, the answer to the question posed above is "no."

Our conclusion is not altered by Richardson's attempt to distinguish the holding in *Spruill* from the facts of this case. According to Richardson, the decision in *Holden* applies here rather than the decision in *Spruill*, because there was no testimony in *Spruill* correlating the defendant's mental development to his age, whereas, in this case and in *Holden*, there was such correlating testimony. However, Richardson does not cite any North Carolina case holding that the presence of such "correlating testimony" requires submission of the (f)(7) mitigation instruction, nor could we find any such case.[18] Richardson's argument therefore is not clearly supported by existing North Carolina law and, accordingly, we are required to reject that argument under the dual lens of the AEDPA and *Strickland* standards that we apply.

---

[18]Moreover, we observe that in *Spruill*, the defendant had I.Q. scores of 64 and 73, and "read at the 5.5 grade level," facts that suggest on their face that the defendant was emotionally and intellectually immature despite a chronological age of 31 years. 452 S.E.2d at 285, 305.

Because we conclude that the MAR court did not hold unreasonably that Richardson failed to demonstrate "prejudice" under *Strickland*, we need not address the MAR court's conclusions that the performance of Richardson's appellate counsel was satisfactory or that any error, if committed, was harmless. *See Strickland*, 466 U.S. at 697; *Buckner*, 453 F.3d at 202. Accordingly, we reverse the district court's grant of a writ of habeas corpus to Richardson on his claim that his appellate counsel rendered ineffective assistance in violation of the Sixth Amendment.

## B.

We next address Richardson's argument that the MAR court erred in denying him relief on the basis that the State withheld exculpatory evidence from him before trial, in violation of *Brady*. The district court declined to grant Richardson relief on this claim, and we review the district court's decision de novo. *Muhammad v. Kelly*, 575 F.3d 359, 367 (4th Cir. 2009). We examine Richardson's argument through the dual lens of the AEDPA standard and the standard set forth by the Supreme Court in *Brady*.[19]

---

[19]The district court reviewed Richardson's *Brady* claim de novo "in an abundance of caution," reasoning that it was unclear whether the MAR court ruled on both aspects of Richardson's *Brady* claim or on only one of the categories of evidence that Richardson alleges was withheld in violation of *Brady*. 769 F. Supp. 2d at 908. We hold that the district court erred in reviewing the *Brady* claim de novo. Although the MAR court did not specifically mention either category of evidence in rejecting the claim, instead referring generically to the alleged "withheld exculpatory evidence," any doubts concerning the breadth of the MAR court's holding must be resolved in favor of the State. *See Harrington*, 131 S. Ct. at 784-85 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). We cannot discern from the MAR court's decision any indication that the court failed to consider both categories of evidence in rejecting Richardson's *Brady* claim. Accordingly, the district court should have analyzed this claim under the deferential standard set forth in AEDPA.

In *Brady*, the Supreme Court held that a due process viola-tion occurs when the prosecution suppresses evidence favor-able to an accused that is material either to guilt or to punishment, irrespective whether the prosecution acted in good faith. 373 U.S. at 87; *see also Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Kyles v. Whitley*, 514 U.S. 419, 432 (1995); *United States v. King*, 628 F.3d 693, 701 (4th Cir. 2011). Such evidence is "material" if there is a reasonable probability that the proceeding would have resulted in a dif-ferent outcome had the evidence been disclosed to the defense. *Strickler*, 527 U.S. at 280; *Kyles*, 514 U.S. at 433; *United States v. Bagley*, 473 U.S. 667, 682 (1985)**;** *see also King*, 628 F.3d at 702. Like the use of the term "reasonable probability" in the context of *Strickland*, a "reasonable proba-bility" under *Brady* is one that is sufficient to undermine con-fidence in the outcome of the proceeding. *Kyles*, 514 U.S. at 434; *Bagley*, 473 U.S. at 682. At the heart of this inquiry is a determination whether the favorable evidence withheld from the defendant reasonably could be considered as placing the entire case in such a different light that confidence in the ver-dict is undermined. *Strickler*, 527 U.S. at 290; *Kyles*, 514 U.S. at 435; *King*, 628 F.3d at 704.

Richardson argues that the State withheld two pieces of evidence that he contends are material. First, Richardson asserts that the State withheld sketches of shoe prints drawn from a ceiling tile taken from the crime scene. According to Richardson, the sketches show a pattern consistent with shoes belonging to Hedgepeth, thus bolstering Richardson's claim that Hedgepeth was present during the commission of the crime. Second, Richardson asserts that the State withheld out-of-court statements made by a testifying witness in which the witness stated that she saw Hedgepeth with Richardson on three occasions on the day of the crime. Although we initially address this evidence on an item-by-item basis, our determi-nation whether the withheld evidence was "material" ulti-mately must be made by considering its cumulative effect. *See*

*Kyles*, 514 U.S. at 436 n.10; *United States v. Ellis*, 121 F.3d 908, 916 (4th Cir. 1997).

i.

We first consider the ceiling tile sketches that Richardson claims are exculpatory. Joyce Petzka, an Agent with the North Carolina State Bureau of Investigations (SBI), examined two pieces of tile found at the crime scene. The first piece of tile, labeled "item 6," was found on the floor of the store. Agent Petzka testified at trial that item 6 bore a shoe impression that matched shoes seized from Richardson.

Agent Petzka also examined a piece of ceiling tile recovered from the store labeled as "item 41," which the State inadvertently discarded before Richardson's counsel had an opportunity to examine it. She testified that item 41 "had several small portions of questioned footwear impressions; however, these impressions were very faint and they were not sufficient for comparison purposes." During cross-examination, Agent Petzka stated that the shoe impression contained on item 41 was not consistent with the shoes worn by Richardson on the night of the crime.

Unbeknownst to Richardson, however, Agent Petzka had drawn sketches of item 41. Richardson first received these sketches during the state post-conviction proceedings. These sketches showed a "zigzag" pattern that Richardson contended was consistent with the pattern of Hedgepeth's shoes.

Richardson unsuccessfully raised this issue in the MAR court as part of his *Brady* claim. The MAR court held that "there is no reasonable possibility that, had the alleged error in question not been committed, a different result would have been reached at trial." As discussed below, the MAR court's decision was not unreasonable and, accordingly, we affirm the district court's rejection of this claim.

First, to the extent that Richardson would have used the police sketches of item 41 to demonstrate that another person's shoeprints were found at the scene of the crime, that evidence was already before the jury. As noted previously, Richardson elicited testimony from Agent Petzka during her cross-examination that there were shoe prints found on a ceiling tile recovered from the store that did not match the shoes seized from Richardson. Agent Petzka was questioned about item 41 as follows:

> Q:   When you say that the other footprints found on [item] number 41 had a zigzag pattern, what do you mean by zigzag pattern?
>
> A:   It's a pattern where it goes up and then comes down and then goes up and then comes back down.
>
> Q:   And that is different than the shoe [Richardson's shoe] that's sitting in front of you, isn't it?
>
> A:   Yes, it is.

Thus, despite the fact that Richardson did not have a sketch of item 41 at his disposal, his counsel was able to elicit testimony concerning the type of shoeprints on item 41 and the fact that those prints were inconsistent with Richardson's shoeprint. Accordingly, the sketches of item 41 do not add any substance to Agent Petzka's testimony and, therefore, do not constitute *Brady* material for this purpose. *See McHone v. Polk*, 392 F.3d 691, 701 (4th Cir. 2004) (undisclosed evidence cannot form basis of a *Brady* violation if it is consistent with trial testimony or merely cumulative to undisputed facts).

Second, with regard to Richardson's contention that the sketches of item 41 would have demonstrated that the other individual's shoeprints were those of Hedgepeth, this argument is pure conjecture. Richardson cannot point to substantial evidence that the print on item 41 matches Hedgepeth's

shoes. The mere fact that the sketches of item 41 and Hedge-peth's shoes both displayed a "zigzag" pattern is insufficient, given the undisputed testimony that the shoe impression on item 41 contained inadequate detail to make a comparison to any particular shoe. On this point, Agent Petzka testified as follows:

> Q.   Ms. Petzka, the item number 41 is a large piece of sheetrock, isn't it?
>
> A.   Yes.
>
> Q.   And when you noted—when you saw it, you saw several portions of questioned footwear impressions, didn't you?
>
> A.   Yes.
>
> Q.   You could see them with the naked eye?
>
> A.   You could see them very faintly if you look at it with side lighting, but they were very small portions and *not sufficient for comparison.*
>
>    . . .
>
> Q.   When you say that there were small portions of foot impression on number 41, what exactly do you mean?
>
> A.   They were just very small. You could see some detail of a shoe impression but it was very faint and was only visible by looking at it from the side. We could not photograph it, we could not get any record of it, to work with, and I was—
>
> [ ]

A. *And I was not able to get anything for comparison purposes.*

Q. Would you have been able to perform any tests or are there any type of tests that you could do to bring something that's real faint out? Is there anything that could do that?

A. No, there really isn't. I had a photographer come over from the photo lab in an attempt to try and use side lighting and everything else, and when looked at from directly in front, which is how it has to be photographed, they just disappeared.

Q. Were you able to come up with any idea as to the size.

A. No.

Q. Were you able to come up with any minute detail whatsoever anywhere as to any shoe?

A. *Not that I could use for comparison*, no.

Q. Were you able to come up—when you say use for comparison, do you mean use for comparison on the shoes that you had?

A. *They were insufficient for comparison to any shoes.*

(Emphasis added.)

We further observe that Richardson cannot identify any evidence in the record refuting Agent Petzka's conclusions.[20]

---

[20]During his post-conviction proceedings, Richardson consulted an expert in the field of forensic science, who reviewed Agent Petzka's testi-

Accordingly, we disagree with Richardson's argument that a reasonable jury could conclude from the evidence that the pattern in Agent Petzka's sketches of item 41 matched the pattern on Hedgepeth's shoes.

ii.

We next consider certain out-of-court statements made by Sadie Atkinson, a trial witness, which Richardson asserts were withheld from him in violation of *Brady*. In the MAR court, Richardson attached an affidavit from Atkinson stating, in part, as follows:

> 5.   Three times on October 6, 1993, Tim Richardson, Kevin Hedgepeth and Michael Newson [sic] came to my residence. Upon every visit, Mr. Richardson came to the door while the other two sat in the small red car. I saw their faces and noticed what they were wearing. Their third visit was around 11:00 p.m. Tim Richardson came to the door and the other two stayed in the car. I couldn't see their faces clearly, but I saw the same clothes that they were wearing earlier that day.
>
> . . .
>
> 7.   Before the trial, I told district attorney, Keith Werner, that Kevin Hedgepeth and Michael Newson [sic] were in Tim Richardson's car when Mr. Richardson visited my house on that night. Mr. Werner told me that he did not want to hear that right now. Mr. Werner told me only to answer the questions asked at the trial and not to volunteer information.

---

mony concerning the insufficiency of the shoeprint impression on item 41. Based on the information available to her, Richardson's consultant did not disagree with Agent Petzka's conclusion that the shoeprint found on item 41 was insufficient to permit a comparison with another shoeprint.

8.  I never told the defense attorneys this information at the trial because they didn't ask me and I didn't volunteer information because of what Mr. Werner told me.[21]

Richardson asserts that the above out-of-court statements made by Atkinson would have provided corroboration for Richardson's defense that Hedgepeth was involved in the crime. However, an obvious weakness in Atkinson's post-conviction affidavit is that it contains information contradicting certain aspects of her trial testimony. For instance, in the affidavit, Atkinson states that Richardson came to her house on the night of the crime *with* Hedgepeth. In contrast, at trial, Atkinson testified that Richardson came to her house on the night of the crime *looking for* Hedgepeth:

Q:  Ms. Atkinson, tell the ladies and gentlemen of the jury if you saw Mr. Richardson on the 6th of October, 1993.

A:  Yes, I did.

Q:  Where did you see him?

A:  He came to my front door of my house at the trailer where I live now.

. . .

A:  He was at my front door . . . and he asked me about two of his friends and I told him I hadn't seen them, and he left. That was all. That was it.

Q:  What two friends did he ask you about?

---

[21]Mr. Werner filed an affidavit in the district court disputing Atkinson's account of their discussion. In light of our analysis, it is unnecessary to resolve any credibility dispute between these two individuals.

> A:   He asked for Mike and he asked me for [Kevin] Hedgepeth. He didn't say Mike who; he just said Mike and [Kevin] Hedgepeth. That's all he said.
>
> Q:   And were they at your residence?
>
> A:   No, they wasn't [sic].
>
> Q:   Were they with [Richardson]?
>
> A:   I don't have any idea.

Atkinson's trial testimony was consistent with her SBI interview, in which she stated that Richardson "was alone when he came to her house." There is no manner in which we can reconcile Atkinson's post-conviction affidavit statements that she saw Richardson together with Hedgepeth on the night of the crime, with her repeated statements to the contrary that she had not seen Hedgepeth with Richardson and that Richardson had asked her whether she had seen Hedgepeth.

Additionally, Atkinson's statement in the affidavit that she "never told the defense attorneys this information at trial because they didn't ask me" is refuted by the trial transcript. Richardson's counsel probed Atkinson's recollection on cross examination, asking her whether Richardson was with Hedgepeth on the night of the crime:

> A:   I told [SBI agents] that I *thought* [Hedgepeth] was with [Richardson] that night; *I didn't know*. But then he had asked me about [Hedgepeth], so I wasn't sure, you know.
>
> . . .
>
> Q:   When Timothy came to your house, it was 10:30 or 11:00 o'clock?

A:　Yeah, somewhere in that vicinity, yes.

Q:　And he was *looking to get up* with [Kevin] Hedgepeth?

A:　With his friends.

Q:　With his friends. And one of those, was that this [Kevin] Hedgepeth?

A:　He did call the name.

. . .

Q:　Did you tell the SBI agents that came to your house that you had seen [Hedgepeth] that day?

A:　I'm not sure.

Q:　You're not sure now?

A:　Not sure of that, no.

(Emphasis added.)

In light of the conflict between the statements in Atkinson's affidavit and her testimony at trial, the impact of her affidavit statement that she saw Richardson with Hedgepeth on the night of the crime is significantly lessened. Further, the probative value of the affidavit statements was minimal because, at best, those statements placed Hedgepeth at Atkinson's house with Richardson nearly forty minutes before the crime could have occurred.[22] Thus, the affidavit statements do not bear on the testimony of the numerous witnesses whose trial testi-

---

[22]According to computer records linked to the store's alarm system, Ms. Rich closed the store about 11:41 p.m. Atkinson stated in her affidavit that Richardson and Hedgepeth arrived at her home around 11:00 p.m.

mony placed Hedgepeth at locations other than the store during the time period in which the crimes occurred.[23]

### iii.

With the above considerations in mind, we conclude our *Brady* inquiry by addressing whether the withheld evidence at issue, when considered cumulatively, is "material" under *Brady*. We again pose the question that federal courts must answer when examining a *Brady* claim through the lens of AEDPA: Was the MAR court's holding that "there is no reasonable possibility that, had the alleged error in question not been committed, a different result would have been reached at trial," incorrect to a degree that this conclusion "was so lacking in justification that [it] was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement?" *See Harrington*, 131 S. Ct. at 786-87.

The answer to this question is "no." The additional evidence concerning the sketches of item 41 did not add any new facts to the trial evidence, and Richardson's argument to the contrary is not supported by the record. In addition, the statements contained in Atkinson's affidavit were in direct conflict with the sworn statements she made at Richardson's trial and, even if true, serve only to place Richardson and Hedgepeth together at least 40 minutes before the criminal activity commenced. Thus, this evidence, even viewed cumulatively, does not place Richardson's trial in such a different light that confidence in the verdict is undermined. *See Strickler*, 527 U.S. at 290; *Kyles*, 514 U.S. at 435. At the very least, the MAR

---

[23]As stated by the district court, these witnesses include "Anthony Hedgepeth, Sam Jones, Tug Lynch, and [Hedgepeth's] uncle and grandmother who all place Kevin [Hedgepeth] with his cousin Anthony around the Tree [an area in town where people were known to hangout], riding home, or at home during the period when the crimes occurred." 769 F. Supp. 2d at 915.

court's conclusion in this respect is not "unreasonable" under the AEDPA standard that we apply. Accordingly, we hold that Richardson's *Brady* claim is without merit, and we affirm the district court's award of summary judgment to the State on this claim.

### C.

Finally, we address Richardson's *Atkins* claim that he is mentally retarded, and that his sentence of death therefore violates the Eighth Amendment's prohibition against cruel and unusual punishments. The MAR court rejected this claim on its merits, and the district court declined to grant this part of Richardson's habeas petition. 769 F. Supp. 2d at 927-28. We review the district court's decision de novo, and we analyze the MAR court's holding in the deferential light mandated by AEDPA. *Cummings v. Polk*, 475 F.3d 230, 237 (4th Cir. 2007).

In *Atkins*, the Supreme Court held that the death penalty may not be imposed on mentally retarded individuals because a national consensus had developed against executing such offenders. 536 U.S. at 316. However, the Supreme Court observed that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317. Thus, the Supreme Court "left to the states the task of developing appropriate procedures to determine whether an inmate who claims to be mentally retarded is in fact mentally retarded." *Walton v. Johnson*, 440 F.3d 160, 176 (4th Cir. 2006) (en banc) (citing *Atkins*, 536 U.S. at 317).

The method of establishing mental retardation in North Carolina is provided by statute. Under N.C. Gen. Stat. § 15A-2005(a) (the statute), the defendant has the burden of proving that he is mentally retarded by establishing "[s]ignificantly subaverage general intellectual functioning, *existing concur-*

*rently* with significant limitations in adaptive functioning, both of which were manifested before the age of 18." N.C.G.S. § 15A-2005(a)(1)(a) (emphasis added).

The first of these two requirements, "[s]ignificantly subaverage general intellectual functioning," is defined by the statute as "[a]n intelligence quotient [IQ] of 70 or below." N.C.G.S. § 15A-2005(a)(1)(c). The statute further provides that the requisite "I.Q." score must derive from "an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist." N.C.G.S. § 15A-2005(a)(2).

The statute also requires that a defendant who claims that he is mentally retarded establish "significant limitations in adaptive functioning." N.C.G.S. § 15A-2005(a)(1)(b). This requirement is defined under the statute as "[s]ignificant limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure skills and work skills." *Id.* A defendant claiming that he is mentally retarded must establish both the "significantly subaverage general intellectual functioning" prong and the "significant limitations in adaptive functioning" prong. N.C.G.S. § 15A-2005(a)(1).

The MAR court held an evidentiary hearing to determine whether Richardson could satisfy his burden of proving that he is mentally retarded. The MAR court found that Richardson failed to establish either of the two requirements set forth by the statute.

With respect to the "intellectual functioning" prong, the MAR court discussed four I.Q. tests that the parties argued had bearing on the issue whether Richardson had an "[I.Q.] of 70 or below," as required by N.C. Gen. Stat. § 15A-2005(a)(1)(c). Richardson proffered I.Q. test scores of 64 and

67, but, as described below, the MAR court held that these results were not qualifying I.Q. scores under the statute.

Richardson's test score of 64 resulted from an aptitude test Richardson took in 1991 while enrolled in the tenth grade. The MAR court noted that a flood destroyed "most of the information" relating to this test. Accordingly, the MAR court observed that "[t]here is no raw test data to support this score as required by the General Statutes, and no way of knowing who administered or how this test was administered." Thus, Richardson's score of 64 on this test was not a qualifying test score under the statute, because there was no evidence that the test was individually administered, or was a "scientifically recognized standardized" I.Q. test, or was "administered by a licensed psychiatrist or psychologist," each of which is required under N.C. Gen. Stat. § 15A-2005(a)(2).

Richardson's test score of 67 resulted from a Wechsler Adult Intelligence Scale Third Edition (WAIS III) test that Richardson took in 2002 at the direction of Dr. John Warren, a licensed psychologist. As noted by the MAR court, Dr. Warren did not personally administer this test. Instead, he "directed his Psychometrician, [John] Tatum, to personally administer this test."[24] Dr. Warren was not present when the test was administered, and Mr. Tatum is not a licensed psychiatrist or psychologist. Accordingly, the MAR court held that Richardson's test score of 67 was not a qualifying score under the statute because the test was not "administered by a licensed psychiatrist or psychologist," as required by N.C. Gen. Stat. § 15A-2005(a)(2).

The State proffered test results showing that Richardson had I.Q. scores of 73 and 74. Richardson's I.Q. score of 73

---

[24]As the district court observed, a "psychometrician" is "a professional who administers and scores psychological and neuropsychological tests under the supervision of a licensed psychologist or neuropsychologist." 769 F. Supp. 2d at 8125 n.12.

resulted from a Wechsler Adult Intelligence Scale Revised (WAIS R) test administered by Dr. John Gorman, a licensed psychologist, in 1995. Richardson's I.Q. score of 74 resulted from a WAIS III test administered by Dr. Mark Hazelrigg, a licensed psychologist, in 2004. The MAR court found that these test scores complied with the requirements of N.C. Gen. Stat. § 15A-2005(a)(2).

The MAR court concluded that because the only standardized I.Q. tests administered to Richardson meeting the requirements of the statute resulted in I.Q. scores of 73 and 74, Richardson could not satisfy his burden of proving "significantly subaverage general intellectual functioning," i.e., "[a]n [I.Q.] of 70 or below." N.C.G.S. § 15A-2005(a)(1)(c).

We again examine this holding through the deferential standard of review mandated by AEDPA, as discussed previously. Because the MAR court's conclusion that Richardson is not mentally retarded is a question of fact, we apply the second prong of the AEDPA standard. Accordingly, we ask whether the MAR court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding?" 28 U.S.C. § 2254(d)(2); *accord Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003). After reviewing the record and the parties' arguments, we find no error in the MAR court's determination that Richardson failed to meet the first prong of the statutory definition of mental retardation because he does not have a qualifying I.Q. score of 70 or below.[25] Thus, our answer to the question posed above is "no."

---

[25]Richardson contends that the MAR court did not adjudicate the merits of the issue whether he proved significantly subaverage intellectual functioning. However, Richardson's contention is refuted by a plain reading of the transcript of the MAR court's evidentiary hearing, as well as the MAR court's order denying his mental retardation claim. Accordingly, we decline Richardson's invitation to review the MAR court's decision de novo rather than under the deferential standard of review set forth by AEDPA.

We are not persuaded by Richardson's additional argument that the MAR court should have adjusted downward his I.Q. scores of 73 and 74 due to the "Flynn effect" and the "practice effect." As described by Dr. Warren during his testimony, the "Flynn effect" is the proposition that an individual gains intelligence over time and, thus, an I.Q. test taken later in life will result in a higher score than had the individual taken the same I.Q. test at an earlier age. 769 F. Supp. 2d at 925. Dr. Warren described the "practice effect" as the proposition that an individual achieves a higher I.Q. score in subsequent I.Q. tests as compared to that individual's initial I.Q. test, when the two tests are taken in a relatively close time frame. *Id.* Although Dr. Warren discussed during the MAR court's evidentiary hearing the impact that the "Flynn effect" and the "practice effect" may have had on Richardson's I.Q. scores above 70, the MAR court declined to adjust Richardson's I.Q. scores on the basis of those theories.

For several reasons, we decline to disturb the MAR court's decision. First, adoption of the "Flynn effect" and the "practice effect" theories, and the corresponding adjustment of Richardson's I.Q. scores, would require us to engage in a de novo review of the MAR court's decision. Indeed, doing so would require us to make our own factual findings. This is precisely the result that is forbidden under AEDPA, which requires deference and respect for a state court's adjudication of a claim on the merits.

Second, Richardson does not cite to any North Carolina law, nor could we find any such law, requiring courts to consider and apply the "Flynn effect" and the "practice effect." To the contrary, N.C. Gen. Stat. § 15A-2005(a) sets forth an I.Q. score threshold of 70 or below without mention of these theories. If the North Carolina legislature had intended that the state courts take these and other theories into account when adjudicating mental retardation claims, the legislature could have so provided in the statute. Thus, under the AEDPA standard we apply in this case, we agree with the district

court's observation that "there is no requirement under N.C. Gen. Stat. § 15A–2005 for a court to adjust a defendant's I.Q. scores downward for such factors." 769 F. Supp. 2d at 927; *see also Green v. Johnson*, 515 F.3d 290, 300 n.2 (4th Cir. 2008) (applying Virginia law in reviewing habeas petition and observing that "neither *Atkins* nor Virginia law appear to require expressly that [the Flynn effect or the standard error of measurement] be accounted for in determining mental retardation status").[26]

---

[26]We observe that in *Walker v. True*, 399 F.3d 315, 322 (4th Cir. 2005) (applying Virginia law), we held that the district court was required to consider on remand the petitioner's argument that his I.Q. score was influenced by the Flynn effect for purposes of his *Atkins* claim. This instruction, however, was a product of the unusual procedural posture of that case. Walker had exhausted his potential post-conviction remedies in the Virginia court system before the Supreme Court issued its decision in *Atkins*. 399 F.3d at 318. Under the governing Virginia statute, Walker was prohibited from filing any successive habeas petitions in the state courts and his "sole remedy shall lie in federal court." 399 F.3d at 318-19 (citing Va. Code § 8.01-654.2). Thus, Walker's claim that he was mentally retarded was never adjudicated on the merits by a state court. The claim was brought in the first instance to the district court, which reviewed the claim de novo. *Id.* The district court's decision was premised on the Commonwealth's motion to dismiss, and, accordingly, the district court was obligated to assume all facts alleged in his habeas petition to be true. *Id.* at 319; *cf. Winston v. Kelly*, 592 F.3d 535, 557 (4th Cir. 2010) (requiring district court to consider Flynn effect on remand in case not arising under AEDPA standard of review because the Virginia state courts did not afford Winston an evidentiary hearing and thus "passed on the opportunity to adjudicate [his] claim on a complete record").

By contrast, Richardson's *Atkins* claim was fully raised in the MAR court, which held an evidentiary hearing and received evidence concerning the Flynn effect and the practice effect. The MAR court adjudicated his claim on the merits, and, accordingly, we apply the significantly deferential review mandated by AEDPA to Richardson's claim. Therefore, contrary to Richardson's contention, our holdings in *Walker* and *Winston* do not require us to overrule the MAR court's determination that Richardson is not mentally retarded under North Carolina law. *See Winston*, 592 F.3d at 558 (observing that the Supreme Court of Virginia "was unconvinced by Winston's evidence concerning the Flynn effect and [the standard error of measurement]" and opining that "a federal court sitting in habeas could not conclude that such a holding violated [AEDPA]").

Because we hold that the MAR court did not unreasonably conclude that Richardson failed to establish "significantly subaverage general intellectual functioning," we need not address the MAR court's conclusion concerning Richardson's failure to establish the other requirement of the statute, "significant limitations in adaptive functioning." N.C.G.S. § 15A-2005(a)(1)(b). In sum, the MAR court's denial of Richardson's motion on the basis that he is not mentally retarded was neither based on an unreasonable determination of the facts nor is an unreasonable application of the Supreme Court's decision in *Atkins*. Accordingly, we affirm the district court's award of summary judgment in favor of the State with respect to Richardson's *Atkins* claim.

### III.

In conclusion, we hold that the district court erred in granting the habeas petition on the ground that Richardson's attorney on direct appeal rendered ineffective assistance of counsel. We reverse this portion of the district court's judgment.

We also hold that the district court did not err in awarding summary judgment to the State with respect to Richardson's *Brady* and *Atkins* claims. We affirm these portions of the district court's judgment. Accordingly, we remand this case to the district court with directions that Richardson's federal habeas petition be dismissed.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*